

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-9-1996

# United States v. Voigt

Precedential or Non-Precedential:

Docket 95-5092

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"United States v. Voigt" (1996). *1996 Decisions.* Paper 97.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/97

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 95-5092
_____

UNITED STATES OF AMERICA

v.

JOHN VOIGT,

Appellant

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Criminal No. 93-cr-00300-1)
_____

Argued January 25, 1996

Before: COWEN and SAROKIN, Circuit Judges, and
POLLAK, District Judge

(Filed  July 9, 1996)
_____

Lawrence S. Lustberg (ARGUED)
Crummy, Del Deo, Dolan,
  Griffinger & Vecchione
One Riverfront Plaza
Newark, New Jersey  07102-5497

COUNSEL FOR APPELLANT

Kevin McNulty
Allan Tananbaum (ARGUED)
Faith Hochberg
Office of United States Attorney
970 Broad Street, Room 502
Newark, New Jersey  07102

COUNSEL FOR APPELLEE

_____

OPINION OF THE COURT
_____

COWEN, Circuit Judge.

John Voigt appeals from a judgment of conviction and sentence entered by the District Court for the District of New Jersey. The conviction arises from Voigt's role as the mastermind of a pernicious "advance fee" scheme whereby Voigt, operating under the auspices of the Euro-American Money Fund Trust, would obtain substantial fees in advance from, respectively, unsuspecting loan applicants and potential investors for various loans and investments that never materialized. Over a three-year period the Trust took in a total of 18.5 million dollars.

Of Voigt's eight assignments of error, two significant constitutional questions are presented for our review. The first is whether the government's use of acquitted codefendant Mercedes Travis, who Voigt alleges was counsel to the Trust and to him personally, as a confidential informant against him constitutes "outrageous government conduct" in violation of the Fifth Amendment's Due Process Clause. The second is whether the district court violated Voigt's Sixth Amendment right to counsel of choice when, citing potential conflicts, it disqualified a third attorney Voigt sought to add to his defense team without holding a formal evidentiary hearing. We also confront several questions of first impression in this Circuit pertaining to the money laundering statute, 18 U.S.C. 1956(a)(1), and its forfeiture counterpart. Id. 982. We must decide whether those statutes require formal "tracing" where laundered funds have been commingled in a bank account with untainted funds. We also must determine what is the proper burden of persuasion for forfeiture proceedings under 18 U.S.C. 982, a question we have addressed previously in two other contexts. See United States v. Pelullo, 14 F.3d 881 (3d Cir. 1994) (RICO; reasonable doubt); see also United States v. Sandini, 816 F.2d 869 (3d Cir. 1987) (CCE; preponderance). Finally, Voigt contests the legal sufficiency of his convictions for tax evasion under 26 U.S.C. 7201, and challenges the orders of the district court requiring him to make restitution in the amount of $7,040,000 and refusing to grant his motions for severance.

For the reasons we set forth below, we will affirm Voigt's conspiracy, money laundering and tax evasion convictions, along with the order of restitution, in all respects. We will vacate the judgment insofar as it incorporates an erroneous order of forfeiture and remand for further proceedings consistent with this opinion.

I.

THE FACTS

John Voigt was the mastermind of a scheme to defraud loan applicants and potential investors by inducing them to pay substantial "advance fees" for nonexistent loans and investments. To implement this scheme, Voigt created two fraudulent entities: Euro-American Money Fund Trust, and Meta Trading and Financial International [hereinafter collectively referred to as "the Trust"]. Voigt fabricated a fictitious genealogy for the Trust, claiming that it was a long-established European financial institution affiliated with the Catholic Church and the Knights of Malta and that it had access to billions of dollars. Voigt also

falsely claimed that the Trust's headquarters was located in Paris, France, and that he was the U.S. Director.  To facilitate the scheme Voigt used various aliases and required loan applicants to fill out bizarre confidentiality agreements that purported to bar customers from disclosing information about the Trust in this life and the afterlife.

The scheme operated from early 1990 until mid-1993.  Brokers for the Trust recounted the false genealogy Voigt had concocted to unsuspecting victims.  At first, the Trust marketed only "loans."  These multi-million dollar loans were supposedly self-liquidating, which meant that, in return for a fee that ranged into the hundreds of thousands of dollars, customers would receive a loan that they did not have to repay.  As soon as the fees were received they were distributed among the coconspirators.  Eventually, the Trust began to market "Master Collateral Commitments" ("MCCs"), bogus financial instruments that were touted as special promissory notes issued by banks and available only through the Trust.  They were marketed to unsuspecting investors for 3.5-4.5 million dollars with the representation that they eventually would yield hundreds of millions of dollars.  All told, Voigt's three-year gain from marketing self-liquidating loans and MCCs was approximately seven and one-half million dollars.

On December 13, 1993, Voigt and four alleged coconspirators--Skip Alevy, Mercedes Travis, Ralph Anderskow, and Donald Anchors--were charged in a twenty-eight-count superseding indictment.  The indictment charged Voigt personally with one count of conspiracy to commit wire fraud, fifteen counts of wire fraud, four counts of money laundering, two counts of tax evasion, and criminal forfeiture allegations arising out of the money laundering counts.  After a three-month trial, a jury convicted Voigt of all counts except one count of wire fraud.  After a nonjury proceeding at which the district court ordered forfeiture of certain automobiles and pieces of jewelry, the court sentenced Voigt to a term of imprisonment of 188 months and ordered him to make $7,040,000 in restitution.  This appeal followed.

Voigt challenges the judgment against him on eight grounds.  He argues that: (1) the government's use of his alleged attorney, Mercedes Travis, as an informant violated his Fifth Amendment due process rights and his Sixth Amendment right to effective assistance of counsel; (2) the district court erred in disqualifying one of his attorneys due to a potential conflict of interest without first making sufficient findings of fact, in violation of his Sixth Amendment right to counsel of choice; (3) there was insufficient evidence to support his conviction on money-laundering counts twenty-five and twenty-six; (4) the forfeiture order should be vacated because the district court failed to require the government to prove beyond a reasonable doubt that the forfeited items were "traceable to" laundered money; (5) his convictions on the tax evasion counts should be vacated because the government failed to prove an affirmative act of evasion as required by statute; (6) the district court erred in imposing an order of restitution without making findings of fact regarding his ability to pay; (7) the district court should have granted his motion for a severance because his co-defendants asserted defenses

antagonistic to his own; and (8) the district court erred in increasing his Guidelines offense level by two points for obstruction of justice.

## II.
## JURISDICTION

The district court had original jurisdiction over this criminal action pursuant to 18 U.S.C.  3231.  We exercise appellate jurisdiction to review a final judgment of conviction under 28 U.S.C.  1291.

## III.
## OUTRAGEOUS GOVERNMENT CONDUCT

Voigt argues that the government infringed his Fifth Amendment right to due process by recruiting his attorney as a government informant "in deliberate and flagrant disregard for the attorney-client relationship."  Voigt's Br. at 10.  The premise of this claim is that codefendant Mercedes Travis, with whom the government had extensive investigative contacts, was his personal attorney during the time of the investigation.  The precise nature of Travis' relationship with Voigt and with the government, however, is in dispute.

### A.

The relevant facts are as follows.  Mercedes Travis began working for the Trust in August, 1990.  Voigt contends that she was engaged as an attorney at that time, and points to an engagement letter that supports his claim.  The government, however, maintains that it justly and reasonably believed that Travis was not and had never been an attorney for the Trust.  In any event, by Travis' own account, she became concerned about the legitimacy of the Trust and feared that she herself was being defrauded.  As a result, she left her post in Europe and approached the FBI with her concerns.  In June and July, 1991, she met with Special Agent Alvin Powell and voluntarily provided him with a package of relevant documents.  Those documents indicated that the Trust was engaged in a fraud.

Over the course of a three-day interview at a New Jersey motel in mid-July of 1991, Travis detailed the fraud for Powell.  Noting that Travis was an attorney, and having seen a letter on Trust letterhead purporting to appoint Travis as attorney for the Trust, Powell asked Travis whether she had acted in a legal capacity for the Trust.  Travis indicated on several occasions that she had not acted as a legal representative for the Trust but, rather, that she had been primarily responsible for initiating and maintaining contacts with banks.  Travis also insisted that the letter purporting to appoint her as an attorney for the Trust was false.

Travis indicated that she went to work for the Trust in 1990, first in the U.S. and later in Europe, believing it to be a bona fide financial institution.  Over time, however, she discovered that, notwithstanding Voigt's contention that the Trust possessed $75 billion in assets, the Trust was simply a shell corporation with few assets.  Travis then related that the Trust was engaged in an advance-fee scheme for loans in which fees were paid but no loan was ever funded.  Based on Travis' allegations, and on Powell's belief that she had not represented the Trust or its members in a legal capacity, Powell enlisted the assistance of

Travis. Powell devised a pretext whereby Travis would reingratiate herself with the Trust by falsely informing Voigt that she had negotiated an MCC. Powell hoped that this would lead Voigt to divulge further information about the Trust's activities. Powell eventually had Travis officially designated as a "cooperating witness" on the FBI's records.

Having enlisted Travis as an informant, Powell asked her to sign a document allowing the consensual recording of her conversations with Trust members, including Voigt. In that document, however, Powell carefully noted that the purpose of the recordings was to corroborate her statements, based on the understanding that she had not acted, and would not act, as an attorney for the Trust or any of its members. In September of 1991, Travis made three supervised calls from the FBI office in New Jersey, although apparently none involved Voigt or his coconspirators.

In October of 1991, Travis informed Powell that she had been invited to Europe by someone associated with the Trust. Powell asked her to maintain contact with him, and she called once during her trip to inform Powell that she had met with Voigt, but that they had discussed only personal matters. When Travis returned from Europe, Powell met her in an Atlantic City hotel, where she provided him with several cassette recordings of conversations, documents obtained during the trip, and information acquired by talking with Voigt. Travis was still convinced that the Trust was engaged in a fraud. According to Powell's version of the meeting, Travis indicated that she had not performed legal work for the Trust or Voigt during her trip to Europe.

In February of 1992, Travis informed Powell that she had prepared a tax opinion for Voigt. She claimed it was a "one-shot deal," and that it concerned Voigt and not the Trust, but she did not share the substance of the opinion with Powell. Powell had no prior knowledge that Travis would be providing legal advice to Voigt. In March of 1992, Travis advised Powell that she had persuaded Voigt to let her become the Trust's attorney, but that her role would be to facilitate communications between the Trust and other entities. Powell became concerned about this latest development because of potential attorney-client privilege problems and because Travis herself might become an active participant in what she had insisted was a fraud. He therefore instructed Travis to meet with Assistant United States Attorney ("AUSA") Paul Zoubek, who was supervising the investigation. Travis replied that she would inform Powell if her status changed from facilitating loans and investments to providing legal advice. Travis next called Powell on March 10 to inform him that she indeed had been appointed as attorney for the Trust. Powell again warned her about acting in a legal capacity and warned her not to engage in any illegal activity. He also gave her a firm date for their meeting with AUSA Zoubek. In another telephone call two days later, Powell again instructed Travis not to act as an attorney, and she reassured Powell that the information she was providing raised no issue of privilege.

On March 25, 1992, Travis and Powell met with AUSA Zoubek at the U.S. Attorney's Office in Newark. After listening to Travis

recount her version of the events, AUSA Zoubek pointed out the stark inconsistency between her original allegation that the Trust was a fraud and her recent decision to rejoin the Trust as its attorney. Travis indicated that she wanted to determine for herself whether in fact the Trust was legitimate and would inform the government of her findings within two weeks. AUSA Zoubek nevertheless told her that she would be on her own, and that any time spent in Europe working for the Trust would not be as a government informant due to potential privilege problems. According to Zoubek, as verified by Powell's notes of the meeting, the only way that information otherwise privileged could be provided to the government would be if the crime-fraud exception were deemed to be applicable. Travis indicated that she understood. At the same time, however, Powell instructed Travis to report to him as to whether the Trust had sufficient funds to cover its existing loan commitments.

From the time of their last meeting on March 25, 1992, until May 1, 1992, Powell did not hear from Travis, but received information indicating that she was participating in the same type of fraudulent conduct that originally had motivated her to come forward to the FBI. On May 1, 1992, Travis made two separate calls to Powell from Europe. Her first call, which Powell maintained was unsolicited, was from a pay phone because, according to Travis, she was afraid her calls were being monitored. Travis again told Powell that the Trust had no funds to lend, and that she would make her "official" call later that day. In her second call, Travis indicated that she was representing Voigt in connection with two grand jury subpoenas for records of the Trust that Powell had served on Voigt. At trial, however, Travis testified that at that point she was representing only the Trust, and that attorney James Binns was representing the Trust and its directors for purposes of the criminal investigation. Powell advised Travis that she and Voigt should appear at the FBI office to discuss the matter. It was not until sometime after this May 1 call from Travis that Powell had Travis officially taken off the books as a confidential informant.

Travis did not contact the government again until September of 1992, when Travis called AUSA Robert Ernst (who had taken over the investigation) to discuss grand jury subpoenas that had been served on the Trust in August. Travis informed Ernst that she was representing the Trust in connection with the subpoenas. Before any further discussion occurred, Ernst informed Travis that she was a target of the investigation and, given her earlier contacts with the government, that she had a conflict of interest and should withdraw as counsel for the Trust. AUSA Ernst documented this admonition in a letter sent to Travis eight days later.

On November 6, 1992, Travis again made an unsolicited call to Powell, warning him that an unsuspecting potential customer was about to transfer $21 million to the Trust and asking him to stop the transaction. In response to a question by Powell, Travis indicated that she was not represented by counsel. After reiterating that Travis was a target, Powell asked Travis whether she would appear voluntarily before a federal grand jury. Travis

agreed to testify.  After Travis had arrived in Newark, but prior to her grand jury testimony, she met with Powell and AUSA Ernst. Ernst repeated that Travis was a target, and informed her of her rights.  Ernst warned Travis not to disclose any confidences between her and any person affiliated with the Trust because of potential attorney-client privilege issues, and stated that he would not ask any questions that would risk eliciting potentially privileged information.  In fact, when Travis indicated that she had brought Trust documents with her to turn over to the government, Ernst refused to examine them.  Notwithstanding Travis' insistence that the documents were not privileged because the Trust did not actually exist, Ernst turned them over to an AUSA who was not part of the investigation into the Trust to make an independent privilege determination.

Before the grand jury, Travis again was informed of her rights and that she was a target of the investigation.  She was again admonished not to disclose privileged information, and when it appeared that she was about to do so, Ernst instructed her not to answer.  On January 12, 1993, Ernst wrote to Travis informing her once more that she was a target of the grand jury's investigation and invited her to provide additional testimony or evidence in her own behalf, which she did on January 15, 1993.

B.

Contending that the government's reliance on Travis to build a case against him constitutes "outrageous government conduct" in violation of the Fifth Amendment's Due Process Clause, Voigt moved pretrial to dismiss the indictment.  The district court declined to hold an independent evidentiary hearing because it determined that Voigt had failed to make a prima facie showing of outrageousness and the trial would address the issues raised by his motion.  The district court ultimately denied Voigt's renewed posttrial motion to dismiss the indictment:

[A]s far as outrageous conduct by the Government, I certainly can't find that here. I have had the benefit of seeing Agent Powell testify, I have seen Mercedes Travis testify and the cross examination of both of them, and I can't find that that was the case.

To the extent there is any conflict between the testimony of Powell and Travis, I credit the testimony of Powell . . . because Powell convinced me that the Government was acting reasonably based upon what Travis had told them when they went forward, even though she was an attorney, that she was not acting as an attorney.  I can't find any outrageous conduct whatsoever here and, of course, we know later, Travis was not a Government agent, [and] was really acting on her own at the time.  I can't see any outrageous conduct whatsoever and I have had the benefit of the full trial hearing on this.

App. at 1122–23.

Our standard of review is mixed. When the district court decides a constitutional claim based on a developed factual record, we exercise plenary review of the district court's legal conclusion. United States v. Driscoll, 852 F.2d 84, 85 (3d Cir. 1988). We defer to the factual findings supporting that conclusion unless they are clearly erroneous. United States v. Bonanno, 852 F.2d 434, 437 (9th Cir.), cert. denied, 488 U.S. 1016, 109 S. Ct. 812 (1989).

1.

In 1952 the Supreme Court recognized that outrageous misconduct by law enforcement officers in detecting and obtaining incriminating evidence could rise to the level of a due process violation. Rochin v. California, 342 U.S. 165, 72 S. Ct. 205 (1952) (vacating conviction and dismissing indictment where police had pumped stomach of suspected drug pusher to obtain incriminating evidence). Since Rochin was decided the Court has discussed the viability of an outrageous government conduct claim only in the context of government instigation of and overinvolvement in the very criminal activity it seeks to punish. See United States v. Russell, 411 U.S. 423, 93 S. Ct. 1637 (1973); see also Hampton v. United States, 425 U.S. 484, 96 S. Ct. 1646 (1976) (five Justices reaffirm viability of due process claim for government overinvolvement in crime). In United States v. Payner, 447 U.S. 727, 100 S. Ct. 2439 (1980), however, the Court discussed, in dictum, whether an illegal search of a third party's briefcase might constitute outrageous government conduct. Id. at 737 n.9, 100 S. Ct. at 2447 n.9. Thus, we have no reason to doubt that the Court continues to recognize a due process claim premised upon outrageous law enforcement investigative techniques.

The showing required to establish a due process violation, though often recited, is by no means pellucid. Writing for the Court in Rochin, Justice Frankfurter said that "the proceedings by which this conviction was obtained do more than offend some fastidious squeamishness or sentimentalism about combatting crime too energetically. This is conduct that shocks the conscience." Rochin, 342 U.S. at 172, 72 S. Ct. at 209. In Russell, the Court elaborated on the standard it had enunciated in Rochin:

> While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, the instant case is distinctly not of that breed. . . . The law enforcement conduct here stops far short of violating that "fundamental fairness, shocking to the universal sense of justice," mandated by the Due Process Clause of the Fifth Amendment.

Russell, 411 U.S. at 431–32, 93 S. Ct. at 1643 (citation omitted).

And in Hampton, the Court's most recent opportunity to visit the outrageous government conduct issue, Justice Powell, concurring in the judgment, noted that "[p]olice overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction." Hampton, 425 U.S. at 495 n.7, 96 S. Ct. 1653 n.7 (Powell, J., concurring in the judgment).

We have also noted that the judiciary is extremely hesitant to find law enforcement conduct so offensive that it violates the Due Process Clause. In United States v. Janotti, 673 F.2d 578 (3d Cir.) (in banc), cert. denied, 457 U.S. 1106, 102 S. Ct. 2906 (1982), we observed that "the majority of the Court has manifestly reserved for the constitutional defense only the most intolerable government conduct." Id. at 608 (emphasis added). Relying on well-settled separation-of-powers principles, we cautioned that

> [w]e must necessarily exercise scrupulous restraint before we denounce law enforcement conduct as constitutionally unacceptable . . . . Unless the behavior of the F.B.I. agents rose to the level of outrageousness which would bar conviction, the conduct of agents of the executive branch who must protect the public from crime is more appropriately considered through the political process where divergent views can be expressed in the ballot box.

Id. at 607, 609.

Subsequent decisions have heeded Janotti's call for judicial restraint. As a result, the doctrine of outrageous government misconduct, although often invoked by defendants, is rarely applied by courts. See United States v. Santana, 6 F.3d 1, 4 (1st Cir. 1993) ("The banner of outrageous misconduct is often raised but seldom saluted."). Although litigants continue to assert the doctrine as a defense against conviction, "courts have rejected its application with almost monotonous regularity." Id. at 4 (collecting cases). Indeed, the doctrine has only once been applied by a federal appellate court since the Supreme Court's Hampton decision in 1976: in this court's decision in United States v. Twigg, 588 F.2d 373 (3d Cir. 1978). Since Twigg, however, "this court and other appellate courts have . . . exercised extreme caution in finding due process violations in undercover settings." United States v. Gambino, 788 F.2d 938, 945 n.6 (3d Cir.), cert. denied, 479 U.S. 825, 107 S. Ct. 98 (1986). See United States v. DeRewal, 10 F.3d 100, 105 n.3 (3d Cir. 1993), cert. denied, 114 S. Ct. 1544 (1994).

2.

Bearing in mind the amount of restraint we must exercise in subjecting law enforcement conduct to judicial review, we must determine whether, as a matter of law, the conduct that Voigt alleges occurred in this case raises a cognizable claim of outrageous government conduct. Despite the paucity of directly relevant authority, we are not writing on a clean slate. Our review of the case law demonstrates that a claim of outrageous

government conduct premised upon deliberate intrusion into the attorney-client relationship will be cognizable where the defendant can point to actual and substantial prejudice.

In United States v. Ofshe, 817 F.2d 1508 (11th Cir.), cert. denied, 484 U.S. 963, 108 S. Ct. 451 (1987), for example, the government used a defense attorney as an informant against the defendant in a matter unrelated to the subject of the attorney's representation (a drug prosecution). With the attorney's permission, the government placed a body bug on him to record conversations with the defendant. Despite strict instructions to the attorney not to elicit privileged information, secret defense strategy concerning Ofshe's drug prosecution was recorded by government agents. Nevertheless, the Eleventh Circuit concluded that this government misconduct was not so outrageous as to violate the Fifth Amendment. Id. at 1516. This conclusion was based on two findings: (1) that the attorney's cooperation concerned a different crime from the one for which he was representing the defendant, thus the invasion of the attorney-client relationship did not produce any evidence against the defendant; and (2) that the defendant was not prejudiced in his defense because the attorney's cocounsel continued to provide zealous representation to the defendant throughout the trial. Id. The court noted, however, that "[h]ad there been demonstrable evidence of prejudice, we would be compelled to reverse." Id. Accord United States ex rel. Shiflet v. Lane, 815 F.2d 457 (7th Cir. 1987) (dismissal not warranted where disclosure of privileged information to police lead to discovery of crucial evidence against defendant because government played no role in the breach of the privilege), cert. denied, 485 U.S. 965, 108 S. Ct. 1234 (1988); cf. United States v. Levy, 577 F.2d 200 (3d Cir. 1976) (dismissal of indictment on Sixth Amendment grounds warranted where government employs codefendant as confidential informant in order to obtain and reveal confidential defense strategy).

Only one decision has ordered that an indictment be dismissed due to preindictment intrusion into the attorney-client relationship so pervasive and prejudicial as to be considered "outrageous." United States v. Marshank, 777 F. Supp. 1507 (N.D. Cal. 1991). In Marshank, Ronald Minkin, the attorney for two cooperating defendants, provided information to the government leading to the indictment of another one of his clients. Minkin then encouraged that client to cooperate with the government in order to secure an indictment against Marshank, with whom Minkin also had an ongoing attorney-client relationship. The government never warned the attorney to avoid ethical impropriety, and affirmatively hid from both the court and the defendants the attorney's multiple, conflict-ridden representation while acting as a government informant. Granting Marshank's motion to dismiss the indictment based on a due process violation for outrageous preindictment conduct, the district court distinguished between passive tolerance and active encouragement of impropriety:

> [T]he government actively collaborated with
> Ron Minkin to build a case against the
> defendant, showing a complete lack of respect
> for the constitutional rights of the defendant

> and Minkin's other clients and an utter
> disregard for the government's ethical
> obligations. . . . [T]he agents and the
> prosecutor here never warned Minkin not to
> engage in unethical behavior and in fact
> facilitated that behavior by hiding it from
> the defendant.  Moreover, the government
> colluded with Minkin to obtain an indictment
> against the defendant, to arrest the
> defendant, to ensure that Minkin would
> represent the defendant despite his obvious
> conflict of interest, and to guarantee the
> defendant's cooperation with the government.

Id. at 1524 (second emphasis added).

### C.

#### 1.

Voigt claims that, at the very least, the factual disputes raised by his moving papers and the government's response warranted an independent evidentiary hearing prior to trial, and that the district court's determination that he had failed to make out a prima facie showing of "outrageous government conduct" was erroneous.  The district court had before it: (1) Agent Powell's affidavit, to which contemporaneous notes of his contacts with Travis were attached as exhibits; (2) Voigt's affidavit, in which Voigt claimed that Travis had been the Trust's and his attorney from the summer of 1990 through June of 1993; (3) Travis' affidavit; and (4) Travis' and Powell's grand jury testimony. Although we agree with Voigt that conducting a hearing prior to trial would have been more prudent and the better practice, a remand is unnecessary under the facts of this case since we find that the record developed at trial, taken together with Voigt's moving papers and the government's response, provided the district court an adequate basis with which to resolve Voigt's constitutional claim.

##### a.

Rule 12(b)(1) of the Federal Rules of Criminal Procedure requires that all "defects in the institution of the prosecution" be raised by pretrial motion.  Fed. R. Crim. P. 12(b)(1).  Although Rule 12 does not by its terms specify when such a motion entitles a defendant to a pretrial evidentiary hearing, we have held that a defendant's moving papers must demonstrate a "colorable claim" for relief.  United States v. Brink, 39 F.3d 419, 424 (3d Cir. 1994) (remanding for hearing where Brink alleged facts that, if true, "could violate a defendant's rights under the Sixth Amendment"). See United States v. Soberon, 929 F.2d 935, 941 (3d Cir.) (if district court had "reasonable suspicion" of prosecutorial misconduct proper course was to hold evidentiary hearing), cert. denied, 502 U.S. 818, 112 S. Ct. 73 (1991).  In order to be "colorable," a defendant's motion must consist of more than mere bald-faced allegations of misconduct.  United States v. Sophie, 900 F.2d 1064, 1071 (7th Cir.) ("A district court does not have to hold evidentiary hearing on a motion just because a party asks for one."), cert. denied, 498 U.S. 843, 111 S. Ct. 124 (1990).  There

must be issues of fact material to the resolution of the defendant's constitutional claim.  See United States v. Panitz, 907 F.2d 1267, 1273-74 (1st Cir. 1990) (refusal to hold evidentiary hearing on outrageousness claim proper because material facts were not in dispute); Sophie, 900 F.2d at 1071 (refusal to hold hearing proper where defendant's own submissions refuted his claim).

As our survey of the relevant case law indicates, see supra III.B.2, in order to raise a colorable claim of outrageousness pertaining to alleged governmental intrusion into the attorney-client relationship, the defendant's submissions must demonstrate an issue of fact as to each of the three following elements: (1) the government's objective awareness of an ongoing, personal attorney-client relationship between its informant and the defendant; (2) deliberate intrusion into that relationship; and (3) actual and substantial prejudice.  See Ofshe, 817 F.2d at 1516; Lane, 815 F.2d at 466; United States v. Santopietro, 809 F. Supp. 1008, 1015 (D. Conn. 1992) (no due process violation where defendant fails to demonstrate that attorney/informant revealed client confidences); Marshank, 777 F. Supp. at 1524.

Although the issue is a close one, after comparing Voigt's motion and Travis' affidavit with the government's response, we think the district court should have conducted an evidentiary hearing.  Travis' relationship with both Powell and Voigt was highly disputed.  Furthermore, Voigt's moving papers raised enough of a specter of ethical impropriety on the government's part to warrant closer scrutiny.  Even the district court, skeptical though it was as to the degree of purposeful intrusion, believed that whatever factual disputes existed on that issue would be resolved at trial.  This was an acknowledgement by the court that there were some disputed factual issues raised by Voigt's motion that needed to be resolved.  Since the government itself notes that suppression of evidence is a more appropriate remedy than dismissal of the indictment, factual determinations that can lead to suppression logically should be resolved at an evidentiary hearing conducted prior to trial.

Conducting a pretrial evidentiary hearing certainly has its advantages.  The district court is then in a position to place in the record its findings of facts and conclusions of law, see Fed. R. Crim. P. 12(e), which greatly facilitates appellate review.  Prieto-Villa, 910 F.2d at 610.  This is especially true where the legal claim, outrageous government conduct, is so highly fact sensitive.  While we are not unmindful of the district court's strong interest in avoiding duplicative proceedings, judicial economy is not fostered when substituting trial testimony for a pretrial hearing generates postverdict and appellate litigation and potentially frustrates appellate review.

b.

Nevertheless, any "error" arising from the district court's failure to hold an independent evidentiary hearing in this case is unquestionably harmless.  Most of the factual issues depended for their resolution on assessing Powell's and Travis' credibility.  In our view, their trial testimony, when taken together with Voigt's motion papers and the government's response, provided the district court with a sufficient evidentiary record

against which to measure Voigt's outrageousness claim. At trial, Voigt cross-examined Powell thoroughly about whether he in fact believed that Travis had acted in a legal capacity on behalf of the Trust or Voigt when she first approached the government. Powell also was cross-examined extensively about the degree to which he encouraged Travis to reestablish contact with the Trust and whether it was his understanding that she would do so in her capacity as an attorney. Travis testified in her own behalf and was cross-examined at length by the government as to her understanding of her relationship with Powell and her role as a confidential informant. Finally, during the trial the district court ruled on numerous claims of attorney-client privilege, which certainly provided it with insight into the nature and degree of any alleged government intrusion into the attorney-client relationship. Thus, the district court's failure to conduct a hearing, although ill-advised, was at worst harmless error.

2.

Voigt claims, however, that even assuming the record as it now stands is sufficiently developed, and we determine that it is, the district court should have dismissed the indictment because the record unequivocally demonstrates outrageous government conduct. Relying on the three-part test we set forth above, supraIII.C.1.a, we hold that Voigt's claim of outrageousness fails as a matter of law with respect to the period between July 13, 1991, and May 1, 1992, because Voigt failed to establish the first element-- the government's objective awareness of an attorney-client relationship between Travis and Voigt during that time. We further agree with the district court's implicit determination that there is insufficient evidence in the record on the second and third elements, purposeful intrusion and prejudice, as to the period thereafter.

a.

Voigt's claim of outrageousness based on the government's contacts with Travis during the period from July 13, 1991 (when Travis first approached the government), to May 1, 1992 (when Travis first announced that she was representing Voigt in response to the grand jury subpoenas), fails as a matter of law for two reasons. First, the record is wholly devoid of any evidence that the government was or should have been aware of a personal attorney-client relationship between Travis and Voigt during that time. Voigt argues that the tax opinion Travis prepared for him should have alerted Powell that by February or March of 1992 Travis had an ongoing personal attorney-client relationship with Voigt. According to Powell, however, Travis claimed that it was a "one-shot deal" and did not share the opinion with him. The district court credited Powell's version of the events, and we find nothing in the record to indicate that the district court's finding in this respect was clearly erroneous. In any event, the record clearly indicates that at about the same time Travis informed Powell of the tax opinion AUSA Zoubek discontinued Travis as a confidential informant.

Voigt also argues inferentially that the government's entire case at trial was based on the premise that the Trust was essentially his "alter ego." Since the Trust was a fictitious

entity, Voigt reasons, any legal work Travis performed for the Trust in reality must have been performed for him personally. In this way Voigt attempts to bootstrap himself into an attorney-client relationship that is essential to the maintenance of his outrageousness claim, at least with respect to the period preceding May 1, 1992. Voigt cannot have it both ways. Having abused the corporate structure such that the Trust, in effect, became his "alter ego," we think that Voigt may not now rely on that abuse as a shield by claiming a personal attorney-client relationship with the attorney for the fraudulent corporate entity. Moreover, far from creating additional protections for officers of fraudulent corporations, the "alter ego" doctrine exists to pierce the corporate veil, thereby stripping those officers of the protections normally associated with the corporate form. See generally Charles Clark, Corporate Law  2.4, at 71 (1986).

In any event, even if Travis' status as an attorney for the Trust were relevant to our resolution of the outrageousness issue, the record fully supports the district court's implicit finding that Powell reasonably believed that Travis was not acting as counsel for the Trust during the period between July 13, 1991, and May 1, 1992. Accordingly, any claim of outrageousness must be premised upon the government's contacts with Travis after May 1, 1992, for that is the day Travis informed the government that she was representing the Trust and Voigt in connection with the very investigation in which she had acted as an informant.

b.

As for Travis' contacts with the government from May 1, 1992, until her indictment, the record falls woefully short of establishing the sort of purposeful intrusion into her attorney-client relationship with Voigt that would rise to the level of outrageousness. For example, Travis made two phone calls to Powell on May 1 1992. Contending that these calls were "staged" to maintain Travis' cover, Voigt asserts that they constitute proof of "purposeful intrusion." We are not persuaded. First, by the time Travis placed these calls to Powell, AUSA Zoubek had affirmatively cut off contact with Travis given her decision to rejoin the Trust as counsel. This demonstrates the government's awareness of and sensitivity to Travis' ethical obligations and belies Voigt's sinister characterization. Second, Powell asserted that he did nothing to solicit the calls, and the record supports his contention. Thus, to the extent that Travis disclosed privileged information, and there is no proof that she did, it was not at the behest of government agents.

All of Travis' post-May 1, 1992, contacts with the government were unsolicited except for her appearances before the grand jury. The government's actions during this period demonstrated sensitivity to potential ethical problems and contradicts Voigt's claim of "purposeful intrusion." Illustrative of the government's sensitivity was Travis' call to AUSA Ernst in September of 1992. Ernst did not attempt to extract information from Travis. Instead, he informed her that she was a target of the investigation and admonished her to withdraw as counsel given her obvious conflict of interest. Travis' next contact with the government was her unsolicited call to Powell in November of 1992

to warn him about an impending fraud.  To the extent that such information was privileged, it was volunteered and cannot have constituted "deliberate intrusion" on the part of the government.  Similarly, we find no impropriety in Powell's asking Travis to appear before the grand jury.  By this time Travis knew she was a target of the investigation and had been warned to withdraw as counsel for Voigt.  Therefore, to the extent Travis continued to provide legal advice to Voigt in connection with the criminal investigation, she was violating her ethical obligation to avoid a conflict of interest.  Finally, AUSA Ernst's efforts to steer clear of privileged information during Travis' grand jury testimony demonstrate that the government was attentive to ethical constraints.  We fail to see any purposeful intrusion on the government's part.

Voigt's alternative claim of purposeful intrusion, which arguably has some merit, might be that the government had an affirmative duty to inform him that Travis had acted as an informant when it discovered that she was representing him in connection with the very criminal investigation in which she had acted as an informant.  At least one court of appeals has speculated as to whether the government, during the investigative phase of a prosecution, may have some affirmative duty to inform a defendant of a potential conflict of interest caused by its prior association with the defendant's lawyer.  See, e.g., United States v. Lopez, 71 F.3d 954, 963-64 (1st Cir. 1995) (attorney for defendant had begun grand jury investigation into his client as AUSA before switching sides).  We need not reach that issue, however, because as our discussion in the next subsection indicates, Voigt has made no showing of prejudice.

c.

We find no evidence in the record of significant prejudice--the third element of our outrageous government conduct test.  As the party bearing both the burden of production and persuasion on his outrageousness claim, Voigt has failed to demonstrate that he suffered any ill effects flowing from the government's allegedly improper investigative activity.  For instance, Voigt does not cite even a single occasion on which Travis gave him legal advice that was calculated to damage him to the benefit of the government.  Nor does he claim that Travis intentionally declined to assert the attorney-client privilege in response to the government's grand jury subpoenas or that Travis advised him to pursue a course of conduct she knew to be illegal simply to help the government build its case.  More significantly, however, Voigt failed to demonstrate that any of the information Travis provided the government after May 1, 1992, was in fact privileged.  We think this alone is fatal to his claim of outrageousness.  Voigt contends on appeal that he does not assail the district court's attorney-client privilege rulings because of the lenient standard of review we would apply.  But we think if Voigt's assertion that "the evidence introduced both prior to and at the trial included hundreds, if not thousands, of privileged attorney-client communications" (Voigt's Br. at 12) had any merit whatsoever, he would have pointed to at least one document Travis provided the government that was privileged.  By failing to meet

his burden to establish the privilege he claims, Voigt has precluded us from finding that an attorney-client relationship between Travis and him ever existed, let alone that it was violated.

Finally, Voigt invokes our decision in Levy, 577 F.2d at 200, along with other similar decisions, in an attempt to have us find that the government's intrusion into his attorney-client relationship, standing alone, is per se prejudicial. Levy, however, is distinguishable on two fronts. First, Levy was decided under the Sixth Amendment. Second, and more importantly, Levy, like most of the cases that Voigt has cited, concerned the government's deliberate intrusion into a defendant's attorney-client relationship in order to gain access to confidential defense strategy. See, e.g., United States v. Valencia, 541 F.2d 618 (6th Cir. 1976) (dismissal appropriate where government obtains defense strategy). The record in this case demonstrates that the government was scrupulous in its effort to avoid procuring confidential defense strategy. See generally Ofshe, 817 F.2d at 1516 (no dismissal warranted where inadvertently intercepted defense strategy not used against the defendant). If any privileged information was disclosed to the government in this case, it concerned the workings of the Trust, not Voigt's legal strategy in responding to the criminal investigation into his activities. Voigt's claim of severe prejudice amounts to little more than an argument that "where there's smoke, there must be fire." We find neither.

## IV.
## RIGHT TO COUNSEL OF CHOICE

Voigt claims that the district court's disqualification of James Binns, a third attorney he sought to add to his defense team, violated his right to counsel of choice under the Sixth Amendment. Voigt seeks per se reversal of his conviction on the theory that the manner in which the district court disqualified Binns was arbitrary.

### A.
#### 1.

The nature and extent of James Binns' relationship with the Trust, like that of Travis, is somewhat ambiguous and eludes precise definition. An attorney who also was Voigt's long-time friend, Binns first came into contact with the Trust in April of 1992 when he was contacted by Travis and Voigt in connection with the government's investigation into the Trust. Shortly thereafter, he accompanied Voigt to the Linwood, New Jersey offices of the FBI and "attempted" to meet with Powell.

Binns then met with Anderskow regarding the grand jury subpoenas that had been served on him. By Binns' own account, he told Anderskow that he would be acting as counsel for Voigt only, but would "facilitate the production of documents to the Government" in connection with Anderskow's subpoena. In a June interview with the FBI, however, in response to the FBI's request to review certain documents, Anderskow apparently stated that Binns had been retained by the Trust and was representing Voigt, Anderskow, and any other Trust members who came under investigation regarding the activities of the Trust. Binns was not present at

Anderskow's interviews, nor did he have any contact with the FBI around that time.

In June of 1992, Travis and Binns spent five days together in a New Jersey hotel assembling documents responsive to grand jury subpoenas that had been served on Voigt and Anderskow that spring. Travis asserted that "Binns was operating in the role of attorney for the Trust and its various members" at that time; Binns maintained that Travis was the attorney for Voigt, Anderskow, and the Trust, and that she withheld many documents from Binns on grounds of attorney-client privilege with respect to those parties.

Binns and Travis also worked together that weekend and periodically until November of 1992, to devise Voigt's defense strategy. According to Binns, he advised Travis numerous times that as a potential target of the grand jury's investigation she should seek a criminal defense attorney to represent her. Travis replied that she did not want an attorney and that she would represent herself.

On November 12, 1992, Binns sent a letter to AUSA Ernst that stated as follows:

> Please be advised that for the limited purpose
> of responding to outstanding subpoenas I am
> representing . . . [the Trust], Ralph
> Anderskow, John Voigt and Jack Dunn.

App. at 56. When Binns filed a notice of appearance in July of 1993 indicating that he was joining Voigt's defense team, which already consisted of two privately retained attorneys, the government submitted a letter to the district court suggesting a potential conflict arising out of Binns' prior representation of the Trust and Anderskow during the investigative phase of the case and requesting a hearing. The government also indicated that there was a possibility that Binns would be called to testify at trial since a potential victim of the Trust had been instructed to deposit his advance fee into Binns' escrow account.

Shortly thereafter, codefendant Mercedes Travis filed a formal motion to disqualify Binns. She submitted an affidavit describing her professional interaction with Binns and his actions in representing the Trust and its members in response to government subpoenas. She argued that when Binns formerly represented the Trust he "was loosely representing all members of the Trust," and that she had consulted with him numerous times when he was acting in that capacity, such that she was in effect a former client of his.

Travis also alleged that Binns might be in possession of certain documents or recordings material to her defense. According to her affidavit, four boxes of her Trust documents and personal material had been shipped to Binns, but only two of those boxes were produced to the government. The remaining boxes and their contents have not been seen since they were shipped from Geneva. Travis maintained that they are in Binns' possession and control. The only missing item that Travis mentioned specifically is a tape of a two-and-one-half-hour telephone conversation between Voigt, and Dunn and herself that she had surreptitiously recorded in March of 1992. Travis stated that she phoned and faxed Binns repeatedly

in an effort to recover her papers and this tape in particular, but Binns did not respond. Travis asserted this as a separate ground for Binns' disqualification, arguing that

> it is possible in the defense of this matter that I may need to have access to this tape or documents or to account for their absence. Mr. Binns may well have duties to his current client not to provide access to this tape or these documents. Mr. Binns could conceivably be the only witness available to me should it be necessary for me to account for the absence of the tape or the documents.

Id. at 71.

In response to the government's letter and Travis' disqualification motion, Binns submitted a letter to the district court attempting to dispel any notion that his representation of Voigt at trial would raise a conflict problem. First, Binns asserted that he never had an attorney-client relationship with Travis. Binns claimed, therefore, that he could not have acquired any confidential information in the course of his association with Travis that would prejudice her defense. Binns also disavowed any knowledge of the potential use of his escrow account in connection with a victim of the Trust. Binns asserted that "[t]here is no possibility that anyone acting in good faith would call me as a fact witness at the trial of this case." App. at 87. Finally, Binns asserted that his alleged "representation" of codefendant Anderskow had been limited to facilitating the Trust's response to the government's subpoenas. Binns also claimed that after Anderskow's meeting with the FBI, in which Anderskow had indicated that Binns was representing the Trust and its members, he made clear to Anderskow that he was representing only Voigt.

With respect to the documents, Binns offered the following account of the way in which they came into his possession and the manner in which he disposed of them:

> In October, 1992 I received four (4) boxes of documents from Jack Dunn. He sent them from Geneva, Switzerland. Messrs. Voigt and Dunn told me that they couldn't get Mercedes Travis to either come to the United States or send documents responsive to Agent Powell's 2nd Grand Jury subpoena. They told me that she refused their repeated requests to send the documents unless she was paid a considerable sum of money.

> When I received the boxes I did not open them or look at the contents. I asked Mr. Voigt to come to my office to pick up the boxes. He said he wanted to produce everything. . . . Mr. Voigt produced all of the documents to the Grand Jury. According to him, Ms. Travis withheld a number of documents

which she had in her possession.

Id. at 86.

                                    2.

Before hearing oral argument on Travis' motion, the district court stated:

> I must say that the record before me raises great concern in my mind. We have here additional counsel. My concern is if we allow this additional counsel to participate, we may wind [] up polluting an otherwise hopefully error-free trial and creating issues of conflict of interest, as well as the possibility that this person who seeks to act as an attorney is, in fact, a potential witness.

Id. at 190-91. Binns then addressed the district court, essentially reiterating his reasons as to why the motion to disqualify should be denied, and offered to take the stand to repeat them under oath. Attorneys for codefendants Anderskow and Anchors indicated their clients' willingness to waive any issue of conflict arising out of Binns' representation of Voigt. Both the government and Travis reiterated why Binns should be disqualified.

The district court did not hold an evidentiary hearing. Instead, relying on the affidavits and Binns' oral representations, the court decided to grant the disqualification motion:

> We have here a number of very serious issues. As a matter of fact, I would characterize it really as a foaming caldron of representation issues here. Such that I am convinced that it would be foolhardy for me to go forward and inject potential error and possible violation of the rights of codefendants in what purports to be a lengthy and complicated criminal case right at its inception before we have even heard any motions.
>
> . . . .
>
> . . . Mr. Binns has had substantial involvement in pre-indictment events concerning the case. I don't need to pass on his credibility versus Ms. Travis's credibility or to the extent that Mr. Anderskow did or did not authorize his representation. We have a letter that he represented him for a limited purpose. We have Mr. Anderskow, according to counsel's submission, saying that he thought Mr. Binns was going to represent him and later saying that he didn't. While Mr. Anderskow certainly can waive any conflict, the waiver would have

to be knowing and voluntary, and we'll get into that a bit later.

And certainly Ms. Travis doesn't waive any issue here. . . .

And I am convinced, based upon the precedent, that it would be very foolish for me to proceed and to allow [Binns to represent Voigt]. . . . [T]o allow him to come into court and cross-examine other persons based upon his personal knowledge, possibly to examine persons as to whom he has represented beforehand, whether directly or otherwise, is exactly the concern that the cases have raised.

Id. at 216–18. The district court went on to note that it did not think that Anderskow's or Anchor's waiver could be considered knowing and voluntary at the beginning of a large multi-defendant, multi-count trial. Binns ultimately was never called to testify at trial, although there were sporadic references to him during testimony.

B.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend VI. One element of this basic guarantee is the right to counsel of choice. Powell v. Alabama, 287 U.S. 45, 53, 53 S. Ct. 55, 58 (1932). The right to counsel of choice, however, is not absolute. Wheat v. United States, 486 U.S. 153, 108 S. Ct. 1692 (1988). Thus, where "considerations of judicial administration" supervene, the presumption in favor of counsel of choice is rebutted and the right must give way. Fuller v. Diesslin, 868 F.2d 604, 607 & n.3 (3d Cir.), cert. denied, 493 U.S. 873, 110 S. Ct. 203 (1989).

Our decision in Fuller reveals that counsel of choice cases can further be divided into two categories. The first and most common type of case involves "arbitrary" denials of the right to counsel. Fuller, 868 F.2d at 604; United States v. Flanagan, 679 F.2d 1072, 1075 (3d Cir. 1982) (Sixth Amendment "goes no further than preventing arbitrary dismissal of the chosen attorney."), vacated on other grounds, 465 U.S. 259, 104 S. Ct. 1051 (1984). A disqualification of counsel of choice is arbitrary not because it is substantively "erroneous," but because it was the product of a failure to balance proper considerations of judicial administration against the right to counsel. See Fuller, 868 F.2d at 604 (flat refusal to admit out-of-state attorneys pro hac vice); United States v. Romano, 849 F.2d 812 (3d Cir. 1988) (summarily denying request for chosen counsel); United States v. Rankin, 779 F.2d 956 (3d Cir. 1986) (summarily denying request for continuance that would permit defendant to retain chosen counsel); United States v. Laura, 607 F.2d 52 (3d Cir. 1979) (failure to make findings essential to balancing required by Sixth Amendment). Under current circuit precedent, arbitrary denials of the right to

counsel of choice mandate per se reversal.  Fuller, 868 F.2d at 607-08 (citing Romano, 849 F.2d at 818, 820).

The second type of right to counsel of choice case concerns "a nonarbitrary, but erroneous denial."  Id. at 609 n.4.  In these cases, as Fuller's dictum describes, "a trial court could make a reasoned determination on the basis of a fully prepared record (hence a nonarbitrary determination), but still err in concluding that counsel of choice should be denied."  Id.  Thus, although a trial court's disqualification decision may be substantively erroneous, it is nonarbitrary because the trial court engaged in the balancing required by the Sixth Amendment and developed the record necessary to do so.  Id.  This is an important distinction for two reasons.  First, and most importantly, Fullersuggested, albeit in dictum, that nonarbitrary-yet-erroneous denials of the right to counsel of choice might be subject to harmless error analysis, and noted that no Third Circuit case has decided that issue definitively.  Id.  Second, the standard of review may be different, for the question whether a disqualification is "arbitrary" is quite different from the question whether the disqualification was substantively unjustified under Wheat and its progeny.

C.

Voigt claims that the district court failed to conduct the sort of inquiry required by our cases and, thus, that it arbitrarily violated his right to counsel of choice.  In the alternative, Voigt contends that even if nonarbitrary, the district court's disqualification decision constituted an abuse of discretion.

1.

Although two potential grounds for disqualification were raised in the district court (Binns' prior representation and his status as a potential witness), it appears that the court relied on only the former.

a.

The district court's oral disqualification decision, which spanned four pages of transcript, indicates that the principal, if not the sole, basis for its decision was Binns' prior status as an attorney for the Trust, Anchors, Anderskow and, perhaps, Travis during the grand jury investigation.  See, e.g., App. at 218 ("[T]o allow him . . . possibly to examine persons as to whom he represented beforehand . . . is exactly the concern that the cases have raised.").  The court viewed this as raising the potential for serious conflicts.  Clearly, the potential for serious conflicts is a consideration of judicial administration that can outweigh a defendant's right to counsel of choice.  Wheat, 486 U.S. at 163, 108 S. Ct. at 1699; United States v. Moscony, 927 F.2d 742, 750 (3d Cir.), cert. denied, 510 U.S. 1211, 111 S. Ct. 2812 (1991); Davis v. Stamler, 650 F.2d 477, 480 (3d Cir. 1981).  There is no question that the trial court performed the balancing required by our cases and considered a factor legitimately weighing against the right to counsel of choice.

Voigt contends that the district court's refusal to hold a separate evidentiary hearing renders the district court's disqualification of Binns per se arbitrary.  He relies on two

authorities in support of his claim: Fuller, 868 F.2d at 604, and, to a lesser extent, United States v. Romano, 849 F.2d 812 (3d Cir. 1988). In Fuller, a defendant who was represented by in-state counsel filed a motion for admission of two out-of-state lawyers pro hac vice to represent him. The state trial court denied the motion without holding a hearing or making particularized findings of fact, on the grounds that the local counsel was competent to try the case and that the admission of the two out-of-state attorneys would likely result in delays and administrative hassles. 868 F.2d at 605. On appeal from the grant of Fuller's petition for a writ of habeas corpus, this court held that "the trial court's wooden approach and its failure to make record-supported findings balancing the right to counsel with the demands of the administration of justice resulted in an arbitrary denial of Fuller's motion for counsel pro hac vice." Id. at 611.

Contrary to Voigt's assertion, our decision in Fullerdoes not stand for the proposition that a trial court's denial of a defendant's chosen counsel must be based on a hearing and supported by factual findings in order to pass constitutional muster. While we held in Fuller that a trial court may not deny a defendant's right to counsel of choice on the basis of generalizations alone, we took pains to clarify that "we d[id] not hold that a court is prohibited from using its 'instinct and judgment based on experience' when it weighs the competing rights of the litigant to counsel of his choice and wise judicial administration." Id. (citation omitted). As long as the court makes a "reasoned determination on the basis of a fully prepared record," its decision will not be deemed arbitrary. 868 F.2d at 609 n.4.

Voigt also cites United States v. Romano, 849 F.2d at 812, in support of his argument that the district court's failure to hold a hearing and make factual findings was reversible error. In Romano, a pro se defendant sought to reserve the right to select counsel of her choice in the event that the court found it necessary to have stand-by counsel take over. The district court summarily denied her request, instead appointing stand-by counsel to back up defendant and potentially take over her defense. This court ruled, as it did in Fuller, that the failure to conduct a hearing and make findings of fact as to the suitability of defendant's chosen counsel violated the defendant's Sixth Amendment rights and constituted reversible error.

Taken together, Fuller and Romano do no more than illustrate the well-established principle that a trial court may not arbitrarily deny a defendant's right to counsel of choice. While in both of those cases the court's failure to hold a hearing or make factual findings was fatal, neither case establishes formal procedures that a court must follow in weighing a defendant's Sixth Amendment right to counsel of choice against the interests of the proper and fair administration of justice. Rather, we found hearings and/or factual findings necessary in those cases because the district courts' determinations had no basis in fact or reason; the trial court in Fuller denied the defendant's request for admission of counsel pro hac vice on the basis of generalizations and speculation, while the district court in Romano denied the

defendant's request for no apparent reason at all.  Without some sort of fact finding or hearing, these determinations could only be considered arbitrary.

In determining whether to disqualify counsel on conflict of interest grounds, the district court need not find an actual, existing conflict of interest.  As the Supreme Court stated in Wheat, the court

> must recognize a presumption in favor of petitioner's counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a showing of serious potential for conflict. The evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court.

486 U.S at 164, 108 S. Ct. at 1700.  Determining whether such a potential conflict exists is no simple task.  "The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials." Id. at 162-63, 108 S. Ct. at 1699.

In this case, the district court heard oral argument, but did not hold an evidentiary hearing.  At the time of the argument, however, the court had before it the submissions of the various parties, including sworn affidavits and documentary evidence attached as exhibits.  This record was fairly substantial-- certainly far more so than anything that was before the courts in Fuller and Romano.  The government's eleven-page letter of August 6, 1993, attached exhibits including: (1) correspondence between Binns and the U.S. Attorney's Office regarding whom he represents; (2) a memorandum and notes by Mercedes Travis regarding litigation strategies and mentioning Binns; and (3) communications with investors in the Trust directing them to contact Binns or deposit funds into his escrow account.  Travis' motion included a sworn affidavit setting forth her relationship with Binns.  Binns' letter to the court laid out his version of events in great detail and attached ninety-six pages of documentary support, including but not limited to affidavits, grand jury transcripts, correspondence to and from Binns, and FBI reports.  Indeed, Binns' letter and supporting documentation were so thorough that he told the court at the hearing, "in substance, you have the story.  The story is contained in my letter . . . ."  App. at 204.  Under these circumstances, we conclude that the record was more than sufficient to enable the district court to make a reasoned and well-informed decision.  Formal findings of fact are not required.

b.

We agree with Voigt, however, that Binns' status as a potential witness, standing alone, cannot render the district court's disqualification order nonarbitrary.  Although Binns' status as a potential witness is certainly a proper consideration of judicial administration, Stamler, 650 F.2d 480-81, the record indicates that the decision to disqualify Binns was based primarily on his alleged prior representation of the Trust and its members.

To be sure, the district court made passing reference to the possibility of Binns' becoming a witness at trial. See App. at 190-91. Yet none of the reasons referred to by the district court in its final oral decision indicated that Binns' status as a potential witness was one of the "considerations of judicial administration" that weighed into its balancing. Moreover, the record is devoid of any "findings" as to Binns' status as a potential witness that would have allowed the district court properly to weigh that consideration against Voigt's presumed right to counsel of choice (and allowed us to exercise appellate review).

The government's retort that "Voigt conspicuously fails to argue that the district court could not have made the necessary findings . . . .," Government's Br. at 34, is unsatisfactory in several respects. First, it all but concedes that the district court failed to make any findings with respect to Binns' status as a potential witness. Second, the government appears to make this argument in suggesting that the district court's disqualification was nonarbitrary. But to be nonarbitrary, as we have noted, the district court actually must make findings based on evidence in the record and weigh those findings against the right to counsel. Permitting the government to argue that there was evidence in the record upon which the district court could have based findings that it concededly failed to make would simply inject a harmless error inquiry into the one area that our right to counsel of choice jurisprudence indicates is singularly inappropriate. Therefore, since the district court failed to address adequately the likelihood that Binns would be called as a witness, record evidence concerning that potential is irrelevant to the "arbitrariness" question.

In any event, we have determined that the court had sufficient other evidence before it to suggest that disqualification was appropriate. It specifically referred to that evidence in announcing its decision to disqualify Binns. That is all our decisions prohibiting arbitrary denials of the right to counsel of choice require. See, e.g., Fuller, 868 F.2d at 604; Romano, 849 F.2d at 812. We therefore reject Voigt's claim that the district court arbitrarily denied his Sixth Amendment right to counsel of choice.

2.

In the alternative, Voigt contends that the disqualification decision amounted to an abuse of discretion because it was unwarranted given the information before the district court. We disagree. In Wheat, 486 U.S. at 153, 108 S. Ct. at 1692, the Supreme Court considered the circumstances under which a trial court, consistent with the Sixth Amendment, could disqualify a defendant's chosen attorney. Wheat involved an attorney's potential representation of several codefendants in the same trial. Referring to the balancing required of trial courts in determining whether a potential conflict warranted disqualification, the Court wrote:

> [A] district court must pass on the issue
> whether or not to allow a waiver of a conflict
> of interest by a criminal defendant not with
> the wisdom of hindsight after the trial has

taken place, but in the murkier pre-trial context when relationships between parties are seen through a glass, darkly. The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials. . . . For these reasons we think the district court must be allowed substantial latitude in refusing waivers of conflicts of interest . . . in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses. . . .

. . . .

. . . The District Court must recognize a presumption in favor of [a defendant's] counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict.

Id. at 162-64, 108 S. Ct. at 1699-1700. The court also noted that, even apart from the requirements of the Sixth Amendment, the district court's independent duty "to investigate potential conflicts arises in part from the legitimate wish of district courts that their judgments remain intact on appeal." Id. at 161, 108 S. Ct. at 1698. Finally, the Court noted with approval that in the case before it "the District Court relied on instinct and judgment based on experience in making its decision." Id. at 163, 108 S. Ct. at 1699.

We begin by observing that the unique factual scenario presented by Binns' proposed representation of Voigt is quite different from the one presented in Wheat. This is not a case where the district court's sole or even primary interest was in protecting Voigt's right to the effective assistance of counsel by disqualifying an attorney whose potential conflicts of interest might impede his ability to defend his client. See, e.g., United States v. Lussier, 71 F.3d 456 (2d Cir. 1995) (reviewing propriety of trial court's decision to accept defendant's waiver of conflict-free representation), cert. denied, 116 S. Ct. 1321 (1996); United States v. Ross, 33 F.3d 1507 (11th Cir. 1994) (reviewing propriety of disqualification ordered to safeguard defendant's right to conflict-free representation), cert. denied, 115 S. Ct. 2558 (1995).

On the contrary, as the record makes clear, what concerned the district court was the possibility that Binns' prior representation of the Trust and its members during the grand jury investigation might affect Anderskow's, Anchor's and Travis' ability to receive a fair trial. Nevertheless, because the effect of a disqualification is to deny a criminal defendant his or her presumptive right to chosen counsel, the question under Wheat is the same, even where the trial court's disqualification of chosen

counsel is aimed at protecting the rights of persons other than the defendant. Thus, we must determine whether the district court's conclusion that there was an actual or serious potential for conflict of interest constituted an abuse of discretion. Cf.Moscony, 927 F.2d at 750-51 (reviewing disqualification of defendant's attorney aimed, in part, at protecting rights of several government witnesses attorney represented at grand jury); United States ex rel. Stewart v. Kelly, 870 F.2d 854 (2d Cir. 1989) (reviewing disqualification of attorney aimed, in part, at protecting rights of witness attorney had represented in the past).

We find no abuse of discretion in the district court's disqualification of Binns. It was undisputed that Binns represented the Trust and Anderskow for purposes of responding to the grand jury subpoenas. There was also a very real possibility that Anderskow might testify at trial, thereby subjecting himself to cross-examination by Binns. We noted in Moscony that "[c]onflicts of interest arise whenever an attorney's loyalties are divided, and an attorney who cross-examines former clients inherently encounters divided loyalties." 927 F.2d at 750 (citation omitted). Since there was a strong possibility that Anderskow might face cross-examination by a former attorney, there was a serious potential for a conflict of interest which, notwithstanding Voigt's attempt to downplay it on appeal, warranted disqualification. Wheat, 486 U.S. at 153, 108 S. Ct. at 1692 (disqualification due to conflict proper despite defendant's attempts on appeal to minimize its extent).

Voigt makes much of the district court's refusal to accept Anchors' and Anderskow's proffered waiver of the attorney-client privilege in the event that Binns would have to cross-examine them at trial. Nevertheless, we find no abuse of discretion in the district court's decision. As the Wheat Court noted, at the beginning of a criminal trial, "[t]he likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict . . . ." Id. at 162-63, 108 S. Ct. at 1699. Here, the district court obviously feared that if during trial the nature of Binns' relationship with Anderskow and Anchors turned out to be more significant than first thought, Anchors' and Anderskow's rights to a fair trial could be jeopardized, thereby generating potential appellate issues. We have recognized that the district court has "an institutional interest in protecting the truth-seeking function of the proceedings over which it is presiding . . . [and] an independent interest in protecting a fairly rendered verdict from trial tactics that may be designed to generate issues on appeal." Moscony, 927 F.2d at 749. Accord Stewart, 870 F.2d at 856-57 ("Wheat emphasized the trial judge's duty to preserve the integrity of the justice system by assuring [all] defendants a fair trial."). We find nothing improper in the district court's refusal to accept Anchors' and Anderskow's proffered waiver.

Moreover, at least one codefendant vehemently refused to waive the attorney-client privilege. Travis was a member of the Trust during the grand jury investigation and had substantial interaction with Binns during that period. Apart from the fact that this only added to the district court's growing concern about

the ability of Voigt's codefendants to receive a fair trial, Binns' prior interaction with Travis may have been sufficient, in and of itself, to warrant disqualification since Binns may have acquired confidential information about her.

In Stamler, for example, we held that a trial court had properly disqualified counsel for a corporation from serving as the criminal defense attorney to the corporation's former president despite the counsel's insistence that he had received no information about the president's criminal activities while acting as counsel to the corporation. "[I]t was not unreasonable for the [trial court] to find that [the lawyer] might have obtained information related to the criminal proceeding." 650 F.2d at 480. In United States v. Rogers, 9 F.3d 1025 (2d Cir. 1993), cert. denied, 115 S. Ct. 95 (1994), the Court of Appeals for the Second Circuit upheld the disqualification of a corporate attorney who sought to represent a corporate officer after having previously attended a deposition with one of the corporation's employees. The deposition concerned the same matter giving rise to the prosecution, and the employee was to testify against the officer during the criminal trial. The Second Circuit rejected the defendant's claim that the disqualification was improper because the attorney-client relationship allegedly giving rise to the conflict was between the corporation and the attorney: "in this case, [the witness], as an employee at [the corporation] when he was deposed, should be considered a privy of the company. As such his joinder in the motion to disqualify [the attorney] was sufficient to assert the adverse nature of his interest and the confidences he may have disclosed . . . ." Id. at 1031.

Here, Travis was adamant that she had imparted confidential information to Binns, and she indicated that she would take the stand in her own defense at trial, thereby subjecting herself to potential cross-examination by Binns. The district court once again had an independent duty to safeguard Travis' right to a fair trial and to protect a potential judgment against her from attack on appeal. See Moscony, 927 F.2d at 751; Stamler, 650 F.2d at 480; see also Rogers, 9 F.3d at 1025.

In sum, we conclude that the district court acted prudently given the unenviable situation with which it was presented. James Binns had substantial involvement in the grand jury investigation and he had sent a letter to the government tacitly acknowledging his multiple representation of Voigt, Anderskow and the Trust. In light of the district court's obvious interest in safeguarding the codefendants' rights to a fair trial by avoiding the possibility that they would be cross-examined by Binns, we hold that the presumption in favor of Voigt's constitutional right to counsel of choice had been adequately rebutted. Accordingly, we reject Voigt's claim that the disqualification of Binns violated his Sixth Amendment right to counsel of choice.

V.

THE MONEY LAUNDERING CONVICTIONS

Voigt alleges that his convictions on two counts of money laundering in violation of 18 U.S.C. 1956(a)(1)(A)(i) are legally insufficient because the government failed to prove beyond

a reasonable doubt that the financial transactions forming the basis of the laundering convictions "in fact involve[d] the proceeds of specified unlawful activity."  Id.  We review sufficiency of the evidence claims under a deferential standard.  "It is not for us to weigh the evidence or to determine the credibility of the witnesses.  The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it."  United States v. Schoolcraft, 879 F.2d 64, 69 (3d Cir.) (internal citations and quotation marks omitted), cert. denied, 493 U.S. 995, 110 S. Ct. 546 (1989).  If "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979), then the verdict of the jury must be sustained.

### A.

In this case, Voigt was convicted of depositing the proceeds of a certain transaction known as the "Neville Price transaction" into an account in the First Fidelity Bank in violation of 18 U.S.C.  1956(a)(1)(A)(i).  The evidence adduced at trial demonstrated that on October 1, 1991, a $500,000 advance fee from the "Neville Price" transaction was deposited into codefendant Ralph Anderskow's escrow account, which at the time contained over $600,000 from other sources.  On October 4, 1991, two wire transfers were made from Anderskow's account to Voigt's First Fidelity account, one for $90,000 and the other for $32,000.  These deposits formed the basis of the two money-laundering convictions that Voigt now challenges.  Voigt contends that because only $500,000 out of the $1.1 million in Anderskow's account was "tainted," the government failed to prove beyond a reasonable doubt that the two wire transfers, which totaled $122,000, "involve[d] the proceeds of specified unlawful activity."  Id.

### B.

Voigt concedes that not all of the money involved in a financial transaction that is the subject of a money laundering charge must derive from the proceeds of money laundering activity.  Rather, he contends that because Congress required that the financial transaction "in fact involve[]" the "proceeds of specified unlawful activity," id. (emphasis added), the government must prove that at least one dollar (or, even, one penny) is traceable to the proceeds of unlawful activity--a mathematical impossibility in cases such as this where (1) the wire transfers came from an account in which tainted funds had been commingled with untainted funds, and (2) the amount of the transfer was less than the amount of untainted funds in the account.  Both the government and Voigt characterize the issue as one involving "which side should bear the uncertainty when tracing becomes an impossibility."  Government's Br. at 46.

While the trend in our sister circuits has been to reject the sort of legal sufficiency challenge raised by Voigt as a matter of statutory construction, see United States v. Cancelliere, 69 F.3d 1116, 1120 (11th Cir. 1995), we need not decide this issue, because we conclude that Voigt's claim fails on the facts.  While the flow-chart that the government relied on to establish the source of the $122,000 deposit does not reveal the source of the

other funds in Anderskow's account, Anderskow himself conceded on cross-examination that all but $26,000 of the funds deposited into his Continental Bank account between 1990 and 1993 were advance fees paid by borrowers of and investors in the Trust. As there was uncontroverted evidence at trial that no borrower or investor ever received any funds from the Trust, and as the jury found that the Trust was the engine of a scheme to defraud, we conclude that a rational trier of fact could easily have concluded that virtually all of the funds in Anderskow's account at the time of the $122,000 transfer represented the fruits of specified illegal activity.

## VI.
### THE FORFEITURE ORDER

In connection with the four money laundering counts charged in the superseding indictment, the government brought separate criminal forfeiture allegations under 18 U.S.C. 982 seeking forfeiture of certain vehicles and pieces of jewelry either as "involved in" or "traceable to" Voigt's money laundering activity, id. 982(a)(1), or as substitute assets under 21 U.S.C. 853(p)(5), the CCE criminal forfeiture provision, which is incorporated in 18 U.S.C. 982(b)(1). At a nonjury proceeding conducted prior to sentencing, the district court determined that Voigt's money laundering convictions rendered him liable to the government for $1,661,960 in criminal forfeiture. In satisfaction of that amount, the court ordered forfeiture of, inter alia, two pieces of jewelry, finding "by a preponderance of the evidence" that they were "items personal property . . . traceable to the money involved in the [money-laundering] violations. App. at 1246. The jewelry had been purchased with funds from an account in which money laundering proceeds had been commingled with other funds -- numerous deposits and withdrawals having intervened between the deposit of the laundered funds and the purchase of the jewelry.

Voigt raises two assignments of error. First, he contends that the district court applied the wrong burden of persuasion. He maintains that our decision in United States v. Pelullo, 14 F.3d 881 (3d Cir. 1994), requires the government to prove its forfeiture allegations beyond a reasonable doubt. Second, Voigt asserts that the government failed to prove that the jewelry it sought was "traceable to" the proceeds of his money laundering activity, since it had been purchased with commingled funds from an account subject to numerous intervening deposits and withdrawals after the original deposit of the laundered funds.

Both of these contentions raise issues of first impression in this circuit. With respect to the burden-of-proof issue, we conclude, as did the district court, that the preponderance standard applies. We agree with Voigt, however, that the numerous intervening deposits and withdrawals into his account subsequent to the deposit of the tainted funds make it impossible to say that the two items of jewelry are "traceable to" property "involved in" the money laundering offense. Accordingly, we will vacate the forfeiture order that was incorporated into the judgment and remand for further proceedings.

### A.

The forfeiture provision upon which the court's order was based, 18 U.S.C. 982, provides that a district court sentencing

a person convicted of, inter alia, money laundering in violation of 18 U.S.C.  1956, "shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property."  18 U.S.C.  982(a)(1).  Voigt first contends that the government's burden of persuasion for criminal forfeiture under 18 U.S.C.  982(a)(1) is proof beyond a reasonable doubt.  We have not yet had occasion to address the burden-of-proof issue with respect to  982(a)(1), and to date only one other court of appeals has considered it, concluding that preponderance-of-the-evidence standard applies.  United States v. Myers, 21 F.2d 826, 829 (8th Cir. 1994), cert. denied, 115 S. Ct. 742 (1995).  We have, however, addressed this issue twice previously in the context of other criminal forfeiture provisions.  Pelullo, 14 F.3d at 881 (RICO; reasonable doubt); United States v. Sandini, 816 F.2d 869 (3d Cir. 1987) (CCE; preponderance).  A description of the Sandini, Pelullo and Myersdecisions is in order.

1.

In Sandini, 816 F.2d at 869, we addressed the appropriate burden of persuasion under 21 U.S.C.  853, the CCE criminal forfeiture provision.  The defendant there argued that  853(d)'s inclusion of a rebuttable presumption of forfeitability if the government could demonstrate two factors by a preponderance of the evidence was unconstitutional to the extent it failed to require proof beyond a reasonable doubt.  After discussing the history of and distinction between civil in rem and criminal in personamforfeiture, we concluded that criminal forfeiture under CCE constitutes punishment for a crime, and not a separate element of the offense, notwithstanding Fed. R. Crim. P. 7(c)(2) (requiring the indictment to specify the extent or interest of the property subject to forfeiture) and Fed R. Crim. P. 31(e) (requiring the jury to return a special verdict on same).  Sandini, 816 F.2d at 875 & n.7 ("assumption" in Rule 31(e) that forfeiture is element of the offense to be tried and proved is akin to nonbinding legislative history).  Because other federal statutes providing for enhanced penalties have established the government's burden of proof as a preponderance of the evidence, we concluded that  853(d) withstands constitutional scrutiny as long as the forfeiture proceeding follows a conviction by proof beyond a reasonable doubt.

Seven years later we confronted the same question in the context of 18 U.S.C.  1963, the RICO statute's criminal forfeiture provision.  Pelullo, 14 F.3d at 881.  We held that the beyond-a-reasonable-doubt standard governs such forfeitures.  Our conclusion was premised mainly on Congress' simultaneous amendments to the RICO and CCE forfeiture statutes in 1984, and its decision not to add a rebuttable presumption provision to  1963(a) when it added such a provision to the CCE statute.  See 21 U.S.C.  853(d) (discussed in Sandini, 816 F.2d at 874-75).  We concluded that the omission was deliberate and, hence, dispositive: "This indicates that Congress intended the higher beyond a reasonable doubt standard to control in a  1963(a) proceeding.  If Congress wanted a preponderance standard for  1963(a), it would have so stated as it specifically did for CCE."  Pelullo, 14 F.3d at 905.  See id. at

903 ("Most important, the CCE rebuttable presumption . . . does notexist in the RICO forfeiture provisions.") (citations omitted).  We distinguished our decision in Sandini on the basis that it pertained only to CCE and could not bind a future panel of this court considering a different forfeiture provision.  See id.("Sandini does not decide the issue in this case because the statute at issue there was CCE, not RICO.").

In Myers, 21 F.3d at 826, the Court of Appeals for the Eighth Circuit concluded that the government's burden of proof under  982(a)(1) was the preponderance standard.  Noting that it had decided in a different case handed down the same day that the preponderance standard governed forfeitures under CCE, the court reasoned that

> [t]he language of the money laundering forfeiture statute is very similar to the language of section 853(a).  By stating that "the court, in imposing sentence on a person convicted" of a money laundering offense, shall forfeit property involved in the offense, Congress indicates that forfeiture under the money laundering provision is also a sentencing sanction, not an offense or element of an offense.

Id. at 829 (alteration omitted).

### 2.

While Sandini and Pelullo are useful guides, we begin by observing that prior decisions of this court interpreting different criminal forfeiture provisions do not constitute binding precedent on the issue before us.  Similarly, the reasoning underlying those decisions is not binding, although to the extent that the statutes are analogous it may be persuasive.  We must begin the task afresh and determine which burden of proof Congress intended to apply to  982(a)(1).

Perhaps the most striking feature of the forfeiture provision is that it requires the district court to order forfeiture "in imposing sentence on a person [already] convicted of an offense in violation of . . . section 1957 . . . of this title . . . . "  18 U.S.C.  982(a)(1) (emphasis added).  As the Myerscourt observed, the plain language of the statute reveals that forfeiture is a form of sentence enhancement that follows a previous finding of personal guilt.  Myers, 21 F.3d at 829.  As a result, we conclude that the preponderance, not the reasonable doubt, standard governs forfeiture under  982(a)(1).

Voigt's most forceful argument to the contrary is that when Congress enacted the money laundering forfeiture statute, it specifically incorporated in  982(b)(1), the statute's procedural component, virtually all of the subsections of 21 U.S.C.  853, the procedural provisions of the CCE forfeiture statute, yet it omitted  853(d), the rebuttable presumption provision we found dispositive in Sandini.  Relying on Pelullo, where we attached much significance to Congress' failure to add a provision like  853(d) to RICO's forfeiture provision, Voigt argues that Congress' decision not to include  853(d) as one of the subsections

incorporated via 982(b)(1) evinces an intent to require application of the reasonable doubt standard. We think Voigt's argument proves too much. At most, Congress may have decided it did not want the rebuttable presumption to apply in money laundering cases. But that by no means compels us to conclude that the reasonable doubt standard should apply in such cases.

Furthermore, acknowledging that the burden of proof is simply a means of expressing our tolerance for erroneous outcomes, there are good reasons for employing the reasonable doubt standard in the RICO context but not in the money laundering context. The RICO forfeiture provision is by far the most far reaching, requiring the district court to order forfeiture of "any interest the person has acquired or maintained in violation of section 1962," 18 U.S.C. 1963(a)(1), as well as any "interest in," "security of," "claim against," or "property or contractual right of any kind affording a source of influence over[] any enterprise which the person has established, operated, controlled, conducted, or participated in the conduct of in violation of section 1962." Id. 1963(a)(2). The statute further requires forfeiture of "any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity . . . in violation of section 1962." Id. 1963(a)(3). Section 1963(a)'s coverage, to say the least, is extremely broad and sweeping. See Rusello v. United States, 464 U.S. 16, 26, 104 S. Ct. 296, 302 (1983) ("The legislative history clearly demonstrates that the RICO statute was intended to provide new weapons of unprecedented scope for an assault upon organized crime and its economic roots."); Craig W. Palm, RICO Forfeiture and the Eighth Amendment: When is Everything Too Much?, 53 U. Pitt. L. Rev. 1, 27 (1991) ("The most striking aspect of RICO's forfeiture provisions is their unprecedented nature and breadth. The language of the forfeiture provisions is extremely broad and comprehensive . . . ."). Indeed, 1963(a) sweeps far more broadly than the elements of the substantive RICO offense itself. See 18 U.S.C. 1962. Accordingly, since the identity and extent of property subject to forfeiture will not have been addressed in the course of proving the substantive RICO charge, a reasonable doubt burden of persuasion ensures greater accuracy in determining the scope of property subject to forfeiture.

In the money laundering context, by contrast, the forfeiture provision makes clear that the government is entitled only to property "involved in" or "traceable to" money laundering activity. See generally United States v. $448,342.85, 969 F.2d 474, 476 (7th Cir. 1992) (government entitled only to "funds" used in offense, not whole account into which such funds had been deposited). Furthermore, "property involved in a financial transaction" is part of an element of the money laundering offense, see 18 U.S.C. 1956(a)(1), and the term "transaction" is defined in the statute. See id. 1956(c)(3). Unlike the RICO context, we have no reason to doubt that the amount of the transaction that forms the basis of a substantive money laundering offense will be identified in the indictment and, thus, that its connection to money laundering activity will have been proved beyond a reasonable doubt at trial. As the government has observed, in many cases the

only factual issues left for resolution after trial will be whether particular items bought with tainted funds are "traceable to" money laundering activity. Applying a beyond-a-reasonable-doubt standard to that issue appears unnecessary. Accordingly, we agree with the Eighth Circuit's decision in Myers that the government's burden for forfeiture under 982(a)(1) is the preponderance standard.

                                    B.

Voigt next argues that the government failed to prove that the money used to purchase the jewelry in question was "traceable to" money laundering proceeds, as required by 18 U.S.C. 982(a)(1). His argument is based on the fact that the jewelry was purchased with funds drawn from an account in which money laundering proceeds had been commingled with other funds, and that those funds were further "diluted" by numerous intervening deposits and withdrawals. Voigt asserts that if the jewelry was subject to forfeiture, it was under 21 U.S.C. 853(p)(5), the CCE substitute asset provision incorporated into the money laundering forfeiture scheme via 18 U.S.C. 982(b)(1). The government counters by observing that criminal forfeiture is an in personam punishment, which obviates the need for strict tracing, especially where tainted and untainted funds are commingled in a bank account, making tracing a virtual impossibility.

                                    1.

The government's observation concerning the in personam nature of criminal forfeiture is helpful to a certain extent: the amount of forfeiture to which the government is entitled under 18 U.S.C. 982 is not dictated by whether the government can prove that certain of the defendant's property is in fact property "traceable to" money laundering activity. When a defendant has been convicted of committing $1.6 million in money laundering offenses (as Voigt was here), the government has proved beyond a reasonable doubt that it is entitled to $1.6 million in criminal forfeiture; that amount represents property "involved in" money laundering activity for purposes of 982(a)(1). What is at issue here is the question of how the government may go about seizing property in satisfaction of that $1.6 million amount.

The government's principal contention is that money is fungible, making it impossible to differentiate between "tainted" and "untainted" dollars in a bank account. The government also advances what is clearly a policy argument, contending that interpreting the term "traceable to" to require even some tracing "would perversely permit money launderers to escape with all of their proceeds intact simply by commingling such tainted proceeds with untainted sums--a result Congress could not have intended." Government's Br. at 53.

To support its arguments, the Government has cited a number of cases dealing with the tracing issue in the context of 18 U.S.C. 1963(a), the RICO statute's criminal forfeiture provision. See generally United States v. Robilotto, 828 F.2d 940, 949 (2d Cir. 1987), cert. denied, 484 U.S. 1011, 108 S. Ct. 711 (1988); United States v. Ginsburg, 773 F.2d 798, 802-03 (7th Cir. 1985) (en banc), cert. denied, 475 U.S. 1011, 106 S. Ct. 1186 (1986); United States v. Conner, 752 F.2d 566, 576 (11th Cir.), cert. denied 474 U.S. 821, 106 S. Ct. 72 (1985). These cases hold that where crime

proceeds have been commingled in a bank account with untainted funds, tracing is not required.  The reasoning supporting those holdings is (1) the in personam nature of criminal forfeiture, and (2) the courts' conclusion that when Congress used the term "traceable to," it could not have intended to require the government to demonstrate some nexus between the criminal activity and the property sought--at least not where cash has been deposited into a bank account.

Regardless of whether these cases were correct on their merits, however, they were decided before the President signed into law the Anti-Drug Abuse Act of 1988.  Pub. L. No. 100-690, 102 Stat. 4374-75 (1988).  With that act Congress added subsection (b) to  982, which incorporates the CCE forfeiture statute's "substitute asset" provision:

> [i]f any of the property described in
> subsection (a) of this section, as a result of
> any act or omission of the defendant . . . has
> been commingled with other property which
> cannot be divided without difficulty; the
> court shall order the forfeiture of any other
> property of the defendant up to the value of
> any property described in paragraph[] . . .
> (5).

21 U.S.C.  853(p)(5).  The inclusion of the substitute asset provision in the money laundering forfeiture scheme represents Congress' express recognition that property subject to criminal forfeiture can be commingled with "untainted" property.  It may also be an acknowledgement by Congress that its earlier-enacted criminal forfeiture provisions, such as RICO and CCE, were unartfully drafted to the extent that they failed to address the problem posed by commingled property.

In our view the specific inclusion in  982 of a substitute asset provision precludes us from interpreting the term "traceable to," as did the courts in the RICO context, to avoid a perceived bad policy result.  See United States v. Ripinsky, 20 F.3d 359, 365 n.8 (9th Cir. 1994) ("  982 . . . defines forfeitable assets to be only those associated with the underlying offense or traceable to the offense and distinguishes between 'forfeitable' and 'substitute' assets.").  Because Congress has made the determination not to "perversely permit money launderers to escape with all of their proceeds intact simply by commingling such tainted proceeds with untainted sums . . . .,"  Government's Br. at 53, we should not be in the business of overlooking the plain terms of a statute in order to implement what we, as federal judges, believe might be better policy.  Accordingly, the government's policy arguments, along with the cases supporting them, are inapposite.

Seeking to avoid our conclusion that cases decided prior to the enactment of the money laundering forfeiture statute are not controlling, the government observes that in 1986 Congress added a substitute asset provision to RICO's forfeiture scheme.  Relying on In re Billman, 915 F.2d 916, 920 (4th Cir. 1990), cert. denied, 500 U.S. 952, 111 S. Ct. 2258 (1991), the government contends that the

addition of a substitute asset provision to the RICO statute could not affirmatively undo the settled judicial determination that the words "traceable to" in the RICO forfeiture statute do not require tracing of commingled funds. The government therefore suggests that in the money laundering forfeiture context it can seek forfeiture of items purchased with commingled funds either as "traceable to" or as substitute assets. We disagree.

As the Ninth Circuit's decision in Ripinsky makes clear, the government's position is internally inconsistent. The substitute asset provision comes into play only when forfeitable property cannot be identified as directly "involved in" or "traceable to" money laundering activity. Clearly, if funds commingled in a bank account are sufficiently identifiable as to be considered "traceable to" money laundering activity, then the substitute asset provision should have no applicability whatsoever. Accordingly, the government's contention that the "traceable to" and substitute asset theories merely create alternative paths to forfeiture, which the government may choose at its option, is illogical.

We also do not understand why an amendment to a statute cannot affirmatively reverse, or at least cast substantial doubt on, prior court decisions interpreting earlier versions of that statute. This is especially true where, in undertaking to discern the plain meaning, those decisions essentially held (for policy reasons) that Congress simply could not have meant what it said. Indeed, if the legitimacy of the courts' interpretation of the RICO statute had been beyond doubt, then the addition of a substitute asset provision to the RICO, CCE and money laundering criminal forfeiture schemes would seem superfluous.

Furthermore, we think the government's interpretation of Billman proves too much. In Billman the Fourth Circuit cited to the prior case law holding that the in personam nature of criminal forfeiture makes tracing under the RICO statute's forfeiture provision unnecessary. It then made the unremarkable observation, which the government apparently finds significant, that "[t]hese principles are embodied in an amendment to the act, which makes provision for the forfeiture of substitute assets." 915 F.2d at 920. Contrary to the government's interpretation, however, that observation may signal the Fourth Circuit's view (which we expressed above) that Congress recognized its unartfulness in using the term "traceable to" in its forfeiture statutes. Moreover, the Fourth Circuit may have recognized that in amending forfeiture statutes to include a substitute asset provision, Congress may have appreciated that courts had been stretching to avoid the result of applying the plain meaning of the term "traceable to" to commingled property.

Even if Billman can be read to suggest that the addition of a substitute asset provision to RICO's criminal forfeiture scheme cannot undo prior judicial interpretations of the words "traceable to" in the RICO context, we simply cannot ignore the plain fact that the money laundering criminal forfeiture provision contains a substitute asset provision that appears to be addressed directly to the situation confronting us in this case. We are unaware of any decision that has imported the restrictive

definition of "traceable to" prevalent in the RICO context into the money laundering forfeiture scheme.

In sum, to accept the government's argument that "traceable to" does not mean what it says for purposes of commingled property, in effect would render the substitute asset provision a nullity, in contravention of a well-settled canon of statutory construction that "courts should disfavor interpretations of statutes that render language superfluous." Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253, 112 S. Ct. 1146, 1149 (1992).

### 2.

We hold that the term "traceable to" means exactly what it says. In light of our holding on the burden of proof, this means that the government must prove by a preponderance of the evidence that the property it seeks under  982(a)(1) in satisfaction of the amount of criminal forfeiture to which it is entitled has some nexus to the property "involved in" the money laundering offense. For example, if the defendant receives $500,000 cash in a money laundering transaction and hides the cash in his house, the government may seize that money as property "involved in" the money laundering offense. If the defendant purchased a $250,000 item with that money, the government may seek the remaining cash as "involved in" the offense, whereas the item purchased is subject to forfeiture as property "traceable to" property involved in the money laundering offense.

Where the property involved in a money laundering transaction is commingled in an account with untainted property, however, the government's burden of showing that money in the account or an item purchased with cash withdrawn therefrom is "traceable to" money laundering activity will be difficult, if not impossible, to satisfy. While we can envision a situation where $500,000 is added to an account containing only $500, such that one might argue that the probability of seizing "tainted" funds is far greater than the government's preponderance burden (50.1%), such an approach is ultimately unworkable. As the Seventh Circuit, speaking through Judge Easterbrook, has observed, a bank account is simply a number on a piece of paper:

> Bank accounts do not commit crimes; people do.
> It makes no sense to confiscate whatever
> balance happens to be in an account bearing a
> particular number, just because proceeds of
> crime once passed through that account. . . .
> An "account" is a name, a routing device like
> the address of a building; the money is the
> "property" [for purposes of the forfeiture
> statute]. Once we distinguish the money from
> its container, it also follows that the
> presence of one illegal dollar in an account
> does not taint the rest--as if the dollar
> obtained from [money laundering activity] were
> like a drop of ink falling into a glass of
> water.

$448,342.85, 969 F.2d 474, 476 (7th Cir. 1992).

The solution, we think, is to give effect to the

substitute asset provision.  See 18 U.S.C.   982(b)(1)
(incorporating 21 U.S.C.   853(p)(5)).  Thus, once a defendant has
commingled laundered funds with untainted funds--whether in a bank
account or in a tattered suitcase--such that they "cannot be
divided without difficulty," 21 U.S.C.   853(p)(5), the government
must satisfy its forfeiture judgment through the substitute asset
provision.  Once property subject to forfeiture under   982(a)(1)
is no longer identifiable due to some act of the defendant, the
government may seek any property, cash or merchandise, in
satisfaction of the amount of criminal forfeiture to which it is
entitled.

                              3.
        In light of our analysis, the district court's forfeiture
order, which is incorporated into Voigt's judgment of conviction
and sentence, cannot stand.  Even under the preponderance standard,
the items of jewelry cannot be considered "traceable to" the
proceeds of money laundering activity; the jewelry was purchased
with funds from an account into which money laundering proceeds had
been commingled with other funds, and after numerous intervening
deposits and withdrawals.  We therefore cannot say that, more
probably than not, the jewelry is "traceable to" money laundering
activity.
        Notwithstanding our conclusion, the government continues
to be entitled to $1.6 million in criminal forfeiture.  But to the
extent that the forfeiture order incorporated in the judgment
required Voigt to hand jewelry over to the government under an
erroneous legal determination, the government is improperly in
possession of that jewelry.  We do not envision that the district
court will have to conduct a de novo forfeiture proceeding on
remand.  Since all that is at issue is the process by which the
government may seize property in satisfaction of the $1.6 million
to which it is lawfully entitled, on remand the government should
be permitted to move to amend the judgment to reflect that the
jewelry is forfeitable as a substitute asset.  Cf. United States v.
Hurley, 63 F.3d 1, 23 (1st Cir. 1995) (no error where, after notice
of appeal from conviction was filed, government moved for and
received from district court permission to seize certain property
as "substitute assets"); Todd Barnet & Ivan Fox, Trampling on the
Sixth Amendment: The Continued Threat of Attorney Fee Forfeiture,
22 Ohio N.U. L. Rev. 1, 55 (1995) ("The substitute assets
provisions constitute a procedural alternative for collecting a
forfeiture judgment and are not a form of punishment in their own
right . . . .").

                              VII.
                   THE TAX EVASION CONVICTIONS
        Voigt contends that his convictions on two counts of tax
evasion under 26 U.S.C.   7201 (relating to the 1990 and 1991 tax
years) are legally insufficient because the government failed to
adduce evidence of an "affirmative act" of tax evasion, which is an
essential element of the offense.

                              A.
        Prior to trial, Voigt moved for and received a bill of
particulars relating to the tax evasion counts because the
indictment failed to specify the affirmative acts on which the

government intended to rely at trial. The bill of particulars indicated four separate acts of evasion: (1) Voigt's submission of a partially false and partially incomplete Internal Revenue Service ("IRS") Form 433-A understating the amount in his First Fidelity Bank account, his failure to fulfill his promise to provide the missing information to an IRS agent, and his failure to tell the agent of his advance-fee income earned in 1989 and 1990; (2) Voigt's decision not to purchase a piece of jewelry with cash when informed that a Currency Transaction Report would have to be filed with the IRS; (3) Voigt's role in requiring potential victims of the Trust to fill out bizarre confidentiality agreements that forbade them from disclosing details of their transaction; and (4) Voigt's maintenance of overseas bank accounts and his direction to Anderskow to wire funds into those accounts. At trial the government introduced evidence on all four affirmative acts.

B.

Essential to a conviction under 26 U.S.C. 7201 is "1) the existence of a tax deficiency, 2) an affirmative act constituting an attempt to evade or defeat payment of the tax, and 3) willfulness." United States v. McGill, 964 F.2d 222, 229 (3d Cir.), cert. denied, 506 U.S. 1023, 113 S. Ct. 664 (1992). Voigt claims that the government's proof at trial failed to establish the second element as a matter of law because none of the alleged affirmative acts shows that his purpose was to evade the payment of taxes. Bearing in mind that "[o]ur review of the sufficiency of the evidence is 'governed by strict principles of deference to a jury's findings,'" id. (quoting United States v. Ashfield, 735 F.2d 101, 106 (3d Cir.), cert. denied, 469 U.S. 858, 105 S. Ct. 189 (1984)), we reject Voigt's legal sufficiency challenge.

1.

With respect to the first affirmative act charged by the government, the submission in September of 1990 of a materially misleading Form 433-A, Voigt claims that "[t]hese false statements could not . . . have been used to evade taxes for 1990 and 1991, taxes which were not even due until April 15, 1991 and April 15, 1992, respectively." Voigt's Br. at 36. The IRS uses Form 433-A to identify potential assets with which a taxpayer who owes back taxes can pay them and to establish a method of collection. Since the form at issue dealt with payment of taxes owed in (or prior to) 1990, and since it was submitted before the deficiencies that are the focus of the tax evasion charges arose, Voigt contends that it cannot have been calculated "to mislead the government or conceal funds to avoid payment of an admitted and accurate deficiency" as a matter of law. McGill, 964 F.2d at 230 (emphasis added).

In McGill we addressed the question whether an affirmative act can predate the existence of a tax deficiency and cited to conflicting authority on that issue. We declined to answer that question definitively, however, because the crime charged in the indictment pointed to the date the deficiency arose as the date of the offense: "The indictment by its terms required the jury to look forward in time for evidence of affirmative acts." Id. at 231. Once again, we decline the parties' invitation to rule as a general matter on whether predeficiency conduct can satisfy the statute's "affirmative act" element. For here, as in McGill,

the superseding indictment charged Voigt with violating 26 U.S.C.
 7201 "[o]n or about April 15, 1991" and "[o]n or about April 15,
1992."  App. at 432, 433.  Accordingly, even if conduct predating
the existence of a deficiency can constitute proof of an
affirmative act of tax evasion, the government's failure to include
the predeficiency period in the indictment's specification of the
offense charged precludes it from relying on conduct predating the
existence of the deficiency as substantive evidence of affirmative
acts of evasion.  McGill, 964 F.2d at 231 ("The Government must
prove attempted evasion for each count beginning at the dates
[charged in the indictment].").

         This same reasoning applies to the government's
contentions that Voigt's failure to fulfill his promise to provide
the IRS agent with income information missing from his Form 433-A
and his failure to disclose to the IRS agent advance-fee income
earned in 1989 and 1990 constitute affirmative evasive acts.  These
actions, like the submission of the false Form 433-A in the first
place, were taken in the context of a collection action for
delinquent taxes from prior years, and preceded the tax liabilities
on which the evasion charges are based.  As with the submission of
the false Form 433-A, we believe that the circumstances do not
warrant a finding that these prior acts were affirmative evasive
acts that laid the groundwork for later tax evasion.

                                2.

         Nevertheless, the three additional affirmative acts
proved by the government at trial, when taken together, are
sufficient to sustain the jury's verdict.  The Supreme Court has
said of the affirmative act element that "[i]f the tax evasion
motive plays any part in such conduct[,] the offense may be made
out even though the conduct may also serve other purposes such as
concealment of other crime."  Spies v. United States, 317 U.S. 492,
499, 63 S. Ct. 364, 368 (1943).  Elaborating on the "affirmative
act" requirement, we stated in McGill that an "affirmative act is
anything done to mislead the government or conceal funds to avoid
payment of an admitted and accurate deficiency."  McGill, 964 F.2d
at 230.  We also noted that "[o]ne act will suffice."  Id. at 229
(citing United States v. Conley, 826 F.2d 551, 556-57 (7th Cir.
1987)).  Whereas simple nonpayment of taxes owed cannot sustain a
conviction under the statute, acts intended to conceal or mislead
are sufficient.

         Voigt argues that the government's proofs as to the
second, third and fourth affirmative acts were legally insufficient
because they were equally consistent with innocent activity and,
more specifically, because there was no evidence linking them to a
"motive" or "intent" to evade.  According to Voigt, therefore,
there must be direct evidence of intent before a rational trier of
fact can conclude beyond a reasonable doubt that an affirmative act
was undertaken, in part, to evade the payment of income tax.
Voigt's legal proposition is without precedential support.

         In the majority of criminal cases, the element of intent
is inferred from circumstantial evidence.  See generally United
States v. Iafelice, 978 F.2d 92, 98 (3d Cir. 1992) ("It is not
unusual that the government will not have direct evidence.  [Mens
rea] is often proven by circumstances.").  The rule is no different

in tax evasion prosecutions. The Supreme Court in Spies stated that "any conduct, the likely effect of which would be to mislead or conceal," is sufficient to satisfy the "affirmative act" element. Spies, 317 U.S. at 499, 63 S. Ct. at 368 (emphasis added). Accord United States v. Mal, 942 F.2d 682, 687 (9th Cir. 1991) (evasion of payment "involves conduct designed to place assets beyond the government's reach after a tax liability has been assessed") (emphasis added); Conley, 826 F.2d at 556 (rational jury can infer intent to evade upon learning of manner in which defendant conducted his financial affairs); United States v. Shorter, 809 F.2d 54, 57–58 (D.C. Cir.) (jury could infer intent to evade where defendant carried on "cash lifestyle"), cert. denied, 484 U.S. 817, 108 S. Ct. 71 (1987); United States v. Voorhies, 658 F.2d 710, 714–15 (9th Cir. 1981) ("Voorhies' conduct in 1974 [of liquidating assets and transporting proceeds to Switzerland] had the 'likely effect' of misleading or concealing."). These cases simply require that there be some evidence from which a jury could infer an intent to mislead or conceal beyond mere failure to pay assessed taxes; it is for the jury to determine, as a matter of fact, whether the affirmative act was undertaken, in part, to conceal funds from or mislead the government.

We have no difficulty concluding, therefore, that Voigt's refusal to pay for a piece of jewelry in cash; his use of bizarre confidentiality agreements; and his maintenance of overseas bank accounts, taken together, provided the jury with sufficient evidence from which it could infer that they were "designed" to evade the payment of admitted tax deficiencies, even if such actions otherwise might constitute wholly innocent conduct. SeeUnited States v. Jungles, 903 F.2d 468, 473–74 (7th Cir. 1990) (activity that is lawful itself can constitute affirmative act to evade); see also United States v. Pollen, 978 F.2d 78, 86 (3d Cir. 1992) (transporting funds to foreign countries, thereby making it more difficult to trace, provides inference of intent to evade), cert. denied, 508 U.S. 906, 113 S. Ct. 2332 (1993).

The evidence at trial indicating a possible motive unrelated to tax obligations for some or all of the affirmative acts, upon which Voigt heavily relies on appeal, was before the jury. It chose to reject Voigt's proffered interpretation and accept the government's. Given our deferential standard of review, United States v. Casper, 956 F.2d 416, 421 (3d Cir. 1992), along with the settled rule that we draw all reasonable inferences in favor of the jury's verdict, Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct 2781, 2789 (1979), we may not substitute our (or Voigt's) judgment for that of the jury; Voigt's legal sufficiency challenge is essentially a futile attempt to rehash his closing argument.

Finally, even were we to agree that, standing alone, the three remaining affirmative acts were insufficient to establish Voigt's intent to evade payment, our decision in McGill instructs that the jury was entitled to consider Voigt's submission of a materially misleading Form 433–A in 1990 as relevant evidence on the question whether his later actions were intended to be evasive. See supra n.25. This provided the jury with ample basis on which to convict, since in 1990 Voigt had materially misled the IRS in

order to hamper its attempts to collect back taxes.  The jury readily could have concluded that Voigt's later actions were not innocent as Voigt claimed but, rather, were part of a conscious and continued attempt to thwart the IRS's collection efforts. Accordingly, we reject Voigt's legal sufficiency challenge to his tax evasion convictions.

## VIII.
## THE RESTITUTION ORDER

At sentencing, the district court ordered Voigt to make $7,040,000 in restitution.  Finding that Voigt had secreted substantial sums of money derived from the Trust's advance-fee scheme, the district court noted in its amended judgment that

> as was demonstrated at trial and at various motion hearings, [] defendant has himself deposited or forwarded to others for deposit in various accounts in various European banks, millions of dollars in cash and other property.  To cite but two examples, the Government has already obtained a release and assignment of funds and property currently frozen at United Overseas Bank in Switzerland in the account of defendant's former girlfriend; and the Government has received a similar release and assignment from defendant pertaining to funds frozen in his accounts at the same bank.

App. at 1394.  Voigt now challenges the district court's restitution order and, more specifically, the lack of "specific findings" as to his ability to pay.  Claiming that "there is no evidence of any funds elsewhere," Voigt's Br. at 48, Voigt asks us to vacate the restitution order and remand for recalculation.  We review the restitution award for abuse of discretion.  United States v. Graham, 72 F.3d 352, 355 (3d Cir. 1995), cert. denied, 116 S. Ct. 1286 (1996).

## A.

In United States v. Logar, 975 F.2d 958 (3d Cir. 1992), we held that when a district court imposes an order of restitution under the Victim and Witness Protection Act ("VWPA"), codified at 18 U.S.C.  3663-64, it is required "'to make specific findings as to the factual issues that are relevant to the application of the restitution provisions . . . .'"  Id. at 961 (quoting United States v. Palma, 760 F.2d 475, 480 (3d Cir. 1985)).  One of the relevant provisions to which the requirement of specific factual findings applies is "the defendant's ability to pay and the financial need of defendant and the defendant's dependents."  United States v. Copple, 24 F.3d 535, 549 (3d Cir.) ("Copple I") (citing Logar, 975 F.2d at 961), cert. denied, 115 S. Ct. 488 (1994)).  The restitution amount must reflect the defendant's ability to pay within five years after the date of sentencing.  18 U.S.C. 3663(e)(2)(C).

In Copple I, the district court ordered restitution of approximately four million dollars after simply adopting as its factual findings the amount of loss to the victims calculated in

the presentence report, but without specific findings on either the amount of loss or Copple's ability to pay. After the case had been remanded to the district court and a resentencing hearing had been held, the court reinstated its restitution order of four million dollars. Although it had made specific findings concerning the amount of the loss, which Copple did not challenge, the district court found that despite the defendant's current financial hardship, he had the potential to earn money in the future given his past success as a businessman.

On appeal a different panel of this court again vacated the restitution award and remanded for resentencing. United States v. Copple, 74 F.3d 479 (3d Cir. 1996) ("Copple II"). We found that a defendant's past success as a businessman, alone, could not justify the four-million-dollar restitution award, since it was unrealistic that the defendant would be able to earn that amount of money over five years. The court made no "findings about Copple's financial needs, and observed only that 'the family is in dire financial straights at this time,' an assertion hardly supportive of the exceptionally large restitution amount it ultimately ordered." Id. at 483.

As to the government's contention that the restitution award should be sustained because it implicitly reflected amounts attributable to assets Copple acquired with misappropriated funds, we agreed that

> [t]he proceeds from a defendant's illegal conduct that the defendant still retains or can recoup are certainly encompassed within the "financial resources of the defendant" that the district court should consider in fashioning a restitution order. Of course, the continued existence of such proceeds is a factual issue that should be accompanied by "specific findings."

Id. at 484 (citation omitted). We went on to note that, in determining a restitution award based on "the court's reasonable belief that there are secreted assets," id., the district court may calculate the total proceeds of defendant's crime minus amounts already accounted for, and then place the burden of accounting for the remainder on the defendant. The defendant may point to specific disbursements indicating that he is no longer in possession of funds obtained as a result of his crimes or assets purchased therewith. "Unless [the defendant] can disprove possession of any remaining amount in this manner, the court may consider the resulting figure as constituting 'financial resources of the defendant.'" Id.

### B.

In light of our decision in Copple II, which was filed after briefing and argument in this case had been completed, we see no basis for setting aside the district court's restitution award as an abuse of discretion. In fact, the district court's analysis was prescient in that it essentially employed the framework contemplated by Copple II for ordering restitution where there is reason to believe that a defendant has secreted proceeds from

illegal activity.  Relying on Copple II, we divide our analysis into two parts.  We first determine whether the district court's finding that Voigt had secreted the proceeds of his crime, thereby shifting to him the burden to explain their whereabouts, was an abuse of discretion.  We then determine whether the district court's ultimate restitution order constituted an abuse of discretion given that the burden of persuasion as to the location of the proceeds, as well as on financial resources and ability to pay, had shifted to defendant.  Copple II, 74 F.3d at 484; 18 U.S.C.  3664(d).

1.

That the district court was entitled to proceed with the sort of analysis contemplated in Copple II cannot seriously be disputed.  The district court's restitution order, along with the evidence at trial, provided ample basis for the court's conclusion that Voigt had attempted to secrete the proceeds of his criminal activity in foreign bank accounts and in his former girlfriend's name.  Since there is evidence in the record to support the district court's "reasonable apprehension that [Voigt] has secreted certain assets," Copple II, 74 F.3d at 484, the derivation of a "starting point" and the concomitant shifting of the burden to the defendant cannot constitute an abuse of discretion.

To the extent that Voigt complains that the district court's starting point ($7,040,000) did not represent the amount of his actual holdings at sentencing, he misses the point.  Copple IImakes clear that once the district court has reasonably concluded that the defendant is concealing the proceeds of his crime, the district court may use as a starting point the entire amount of the loss caused minus any amount already accounted for (in this case, the amount sought by the government in forfeiture).  Again, we see no abuse of discretion in the district court's decision to require Voigt to account for the entire $7,040,000.

2.

The essence of Voigt's complaint is that the district court's ultimate restitution award was the same amount as the starting point it had derived.  Voigt assails the district court's failure to make specific findings on his ability to pay or on his financial resources.  But under Copple II and 18 U.S.C.  3664(d), it was Voigt who bore the burden of persuasion (and, logically, the burden of production) on whether he possessed the $7,040,000 in crime proceeds and on the issue of his financial resources and needs.  Voigt failed to adduce sufficient evidence on either subject.  For instance, Voigt never submitted to the Probation Department a completed Personal Financial Statement form.  Instead, he claimed that he was "living off savings and other assets," yet never accounted for the source of those funds.  This was simply insufficient to demonstrate by a preponderance of the evidence his financial resources and needs.  United States v. Cannistraro, 871 F.2d 1210, 1214 (3d Cir. 1989) (no abuse of discretion where restitution amount not reduced to reflect ability to pay when defendant fails to adduce evidence on that subject).

Given Voigt's complete failure to meet his statutory burden of demonstrating his financial resources and needs, it is not surprising that the district court was unable to announce

"specific findings" on that subject. Quite simply, because Voigt had failed to account for the $7,040,000 in crime proceeds, and because he failed to adduce sufficient evidence on his ability to pay and financial needs, the district court had no choice but to impose what had been its "starting point" as the final amount of restitution. Such a result is entirely "consistent with . . . our policy-based conviction that defendants ought not be permitted to profit, quite literally, from uncertainty for which their illegal conduct is ultimately responsible." Copple II, 74 F.2d at 484. Put another way,

> if the government bore the burden of proving that such defendants still possess illegally obtained assets, the government would be unable to locate hidden assets, those assets would not be taken into account in framing restitution orders, and the defendants would continue to profit at the expense of the innocent victims. This would be unconscionable.

> The solution is to place the burden of proof on the defendant to show what has happened to all of the illegally obtained assets. All assets for which the defendant cannot account may be included in the amount of restitution ordered. To the extent that records are unavailable, the risk of inaccuracy should be borne by the defendant rather than the victims.

Id. at 486 (Alito, J., concurring) (citation omitted).

Finally, we do not view the district court's decision to accept Voigt's representations of indigency for purposes of appointing appellate counsel as mandating a contrary result. The district court explained that it did so simply to expedite Voigt's appeal. In United States v. Hallman, 23 F.3d 821, 827 (3d Cir.), cert. denied, 115 S. Ct. 216 (1994), we held that a finding of indigence at the time of sentencing is not a bar to imposing restitution as long as the award is based "on realistic prospects that the defendant will be able to pay it, and not on fantastic or overly speculative possibilities." Copple II, 74 F.3d at 485. Given the district court's record-supported findings that Voigt concealed substantial sums of crime proceeds, and given Voigt's failure to rebut those findings with competent evidence, the district court's restitution order was based on "realistic prospects that the defendant will be able to pay it . . ." Id.

IX.

THE MOTIONS FOR SEVERANCE

Finally, Voigt argues that the district court erred in denying his motions to sever his trial from those of his codefendants on the ground of mutually antagonistic defenses, and that his convictions must therefore be reversed. The district court's denial of Voigt's motion is reviewable only for abuse of

discretion.  United States v. Thornton, 1 F.3d 149, 152 (3d Cir.),
cert. denied, 114 S. Ct. 483 (1993).

                                A.

          In appealing his conviction on this ground, Voigt faces
an uphill battle.  As the Supreme Court has recently noted,
"[t]here is a preference in the federal system for joint trials of
defendants who are indicted together."  Zafiro v. United States,
506 U.S. 534, 113 S. Ct. 933, 937 (1993).  See Fed. R. Crim. P. 8(b)
("Two or more defendants may be charged in the same indictment or
information if they are alleged to have participated in the same
act or transaction or in the same series of acts or transactions
constituting an offense or offenses.").  Such joint trials promote
efficiency in the courts and serve the interests of justice by
preventing "the scandal and inequity of inconsistent verdicts."
Zafiro, 506 U.S. at 537, 113 S. Ct. at 937 (quoting Richardson v.
Marsh, 481 U.S. 200, 209, 107 S. Ct. 1701, 1708 (1987)).  In
addition, joint trials of defendants charged under a single
conspiracy aid the finder of fact in determining the "full extent
of the conspiracy," United States v. Provenzano, 688 F.2d 194, 199
(3d Cir.), cert. denied, 459 U.S. 1071, 103 S. Ct. 492 (1982), and
prevent "the tactical disadvantage to the government from
disclosure of its case."  United States v. Jackson, 649 F.2d 967,
973 (3d Cir.), cert. denied, 454 U.S. 1034, 102 S. Ct. 574 (1981).

          As a result, when defendants have been properly joined
pursuant to Rule 8(b) of the Federal Rules of Criminal Procedure,
"a district court should grant a severance under Rule 14 only if
there is a serious risk that a joint trial would compromise a
specific trial right of one of the defendants, or prevent the jury
from making a reliable judgment about guilt or innocence."  Zafiro,
506 U.S. at 539, 113 S. Ct. at 938.  See Fed. R. Crim. P. 14 ("If it
appears that a defendant or the government is prejudiced by a
joinder of . . . defendants . . . for trial together, the court may
order an election or separate trials of counts, grant a severance
of defendants or provide whatever other relief justice requires.").

          Many courts have recognized that such a risk arises when
codefendants assert "mutually antagonistic" defenses.  See Zafiro,
506 U.S. at 538, 113 S. Ct. at 937 (collecting cases).  Even where
a defendant establishes that his defense and those of his
codefendants are mutually antagonistic, however, severance is not
mandatory.  Id., 113 S. Ct. at 938.  Mutually antagonistic defenses
are not prejudicial per se; and even if they were, Rule 14 "leaves
the tailoring of the relief to be granted, if any, to the district
court's sound discretion."  Id. at 539, 113 S. Ct. at 938.
Therefore, to obtain a reversal of conviction for failure to sever
where codefendants assert mutually antagonistic defenses, a
defendant "must demonstrate clear and substantial prejudice
resulting in a manifestly unfair trial."  United States v.
Reicherter, 647 F.2d 397, 400 (3d Cir. 1981).

          Although precise articulations may differ, courts agree
that "[m]utually exclusive defenses . . . exist when acquittal of
one codefendant would necessarily call for the conviction of the
other."  United States v. Tootick, 952 F.2d 1078, 1081 (9th Cir.
1991).  This type of situation arises "when one person's claim of
innocence is predicated solely on the guilt of a co-defendant."

United States v. Harris, 9 F.3d 493, 501 (6th Cir. 1993).  In
determining whether mutually antagonistic defenses exist such that
severance may be required, the court must ascertain whether "the
jury could reasonably construct a sequence of events that
accommodates the essence of all appellants' defenses."  United
States v. Perez-Garcia, 904 F.2d 1534, 1548 (11th Cir. 1990).

While mutually antagonistic defenses have been much
discussed in theory, only rarely have courts found that they exist
in practice.  See Zafiro, 506 U.S. at 538, 113 S. Ct. at 937; see
also Tootick, 952 F.2d at 1078 (finding mutually antagonistic
defenses warranting reversal where two defendants charged with
assault both defended themselves by arguing that the other
committed the assault alone).  Far more frequently, courts have
concluded that the asserted defenses, while in conflict with one
another, are not so irreconcilable that "[t]he jury could not have
been able to assess the guilt or innocence of the defendants on an
individual and independent basis."  Tootick, 952 F.2d at 1083.
See, e.g., United States v. Flanagan, 34 F.3d 949, 952 (10th Cir.
1994) (affirming denial of motion to sever because a jury "could
logically" accept one defendant's defense without concluding that
the codefendant was guilty, and vice versa); Harris, 9 F.3d at 501
(affirming denial of motion to sever trials of coconspirators, one
of whom claimed innocence and the other of whom claimed entrapment,
on the ground that these defenses are not inconsistent because the
jury could logically have accepted both); Perez-Garcia, 904 F.2d at
1548 (affirming denial of motion to sever because "the jury could
reasonably construct a sequence of events that accommodates the
essence of all appellants' defenses").

Moreover, courts have consistently held that finger-
pointing and blame-shifting among coconspirators do not support a
finding of mutually antagonistic defenses.  See Provenzano, 688
F.2d at 198 (affirming denial of motion to sever where all
defendants blamed one coconspirator on the ground that these
defenses were not antagonistic, because if jury had believed that
only one defendant was to blame there would have been a failure of
proof on the conspiracy charges); see also United States v. Smith,
44 F.3d 1259, 1266-67 (4th Cir.) (affirming denial of motion to
sever where defendant's codefendants claimed that he ran the whole
scheme and they were just victims of his criminal influence), cert.
denied, 115 S. Ct. 1970 (1995); United States v. Linn, 31 F.3d 987,
992 (10th Cir. 1994) (affirming denial of motion to sever where
each coconspirator defended himself by blaming the others on the
ground that the jury could have believed all defendants' theories
and acquitted them all); United States v. Rivera, 6 F.3d 431, 438
(7th Cir. 1993) (affirming denial of motion to sever where
codefendants in a drug conspiracy all claimed ignorance and blamed
each other on ground that "plain and simple blame-shifting" does
not necessarily prevent jury from making reliable judgment about
guilt or innocence), cert. denied, 114 S. Ct. 1098 (1994); United
States v. Barber, 442 F.2d 517, 530 (3d Cir.) (holding that "the
mere presence of hostility among defendants or the desire of one to
exculpate himself by inculpating another" are insufficient grounds
to require severance), cert. denied, 404 U.S. 958, 92 S. Ct. 327
1971).  These cases illustrate the well-settled principle that

"defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials."  Zafiro, 504 U.S. at 540, 113 S. Ct. at 938.

                                   B.

          Voigt's argument is essentially indistinguishable from those that were rejected in the conspiracy cases cited above.  The basis of his claim is that his codefendants "directed blame at [him] as the architect of the scheme . . . ."  Smith, 44 F.3d at 1267. Travis argued throughout the trial that Voigt had deceived her, and that "[s]he was one of the victims of John Voigt."  App. at 985 (Travis' counsel's closing argument).  Similarly, Anderskow and Anchors argued that they were pawns in a scheme created and perpetrated by John Voigt.

          Voigt contends that "the defenses presented [by his codefendants] would, in order to have succeeded, have required defendant Voigt's conviction, and certainly enhanced that possibility."  Voigt's Br. at 30.  In light of the case law and on logical grounds, we disagree.  The basic theory behind the defenses of Travis, Anderskow, and Anchors was that they lacked criminal intent.  Although it is fairly clear that these defenses, by pointing the finger of blame at Voigt, increased the likelihood that Voigt would be convicted, the Supreme Court has stated that this type of injury alone does not mandate severance.  Zafiro, 506 U.S. at 540, 113 S. Ct. at 938.  As the government correctly argued in its brief, "it was not logically impossible for the jury to have either (i) disbelieved all of the defenses, given the government's affirmative proof or (ii) believed all of them, on the basis that the government had not adduced sufficient evidence of intent." Government's Br. at 39.  Under these circumstances, we cannot conclude that the defenses in this case were mutually antagonistic.

          The limiting instructions that the district court gave to the jury reinforce our conclusion.  See Smith, 44 F.3d at 1267; Rivera, 6 F.3d at 438.  The court instructed the jury (1) to "consider each count of the indictment and each defendant's involvement in that count separately," (2) that "the burden is always on the prosecution to prove guilt beyond a reasonable doubt," (3) that its "verdict as to any defendant on any count should not control [its] verdict as to any other defendant or any other count," and (4) that opening statements and closing arguments are not evidence.  Anderskow's App. at 4251, 4257 & 4278.  We are convinced that these instructions "were sufficient to cure any potential prejudice from antagonistic defenses."  Rivera, 6 F.3d at 438 (relying on similar instructions).  We therefore conclude that the district court did not abuse its discretion in denying Voigt's motions for a severance.

                                   X.
                               CONCLUSION

          We will affirm Voigt's conspiracy, money laundering and tax evasion convictions, as well as the district court's order of restitution.  We will vacate the forfeiture order, which is incorporated into the judgment of conviction and sentence, and remand for further proceedings consistent with this opinion.

TO THE CLERK:

        Please file the foregoing opinion.


                        United States Circuit Judge




                    M E M O R A N D U M




TO:     P. Douglas Sisk, Clerk

FROM:   Judge Cowen

DATE:   July 8, 1996

RE:     U.S.A. v. Voigt, No. 95-5092, argued 1/25/96


Dear Doug:

        Please file the enclosed opinion which has cleared in
accordance with our procedure.  A signed original will be mailed
today.  Also, please note that Voigt's appeal was consolidated for
argument with the appeals of U.S.A. v. Anderskow, No. 95-5093, and
U.S.A. v. Anchors, No. 95-5094.  The opinion disposing of
Anderskow's/Anchors' appeals is being filed simultaneously
herewith.

                        Sincerely,



                        Robert E. Cowen



REC/ds
enclosure
cc:  Judge Sarokin (memo only)
     Judge Pollak (memo only)
     Pat McCafferty (memo only)