*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

SHEAN TROY AMERSON,

        Defendant-Appellant.

UNPUBLISHED
September 17, 2025
11:27 AM

No. 375165
Oakland Circuit Court
LC No. 2023-283209-FC

Before: CAMERON, P.J., and MURRAY and KOROBKIN, JJ.

PER CURIAM.

Defendant, Shean Troy Amerson, is charged with first-degree murder, MCL 750.316, and first-degree child abuse, MCL 750.136b. In this interlocutory appeal, defendant appeals by leave granted[1] the trial court's order denying his motion to disqualify the Oakland County Prosecutor's Office. Because we conclude that defendant's right to due process does not require the prosecutor's disqualification under the facts of this case, we affirm.

## I. BACKGROUND AND FACTS

Defendant's charges arise from the death of his girlfriend's three-year-old daughter as a result of severe injuries allegedly sustained while in defendant's care. The prosecution's theory of the case is that defendant inflicted that fatal trauma, whereas defendant denied harming the child. Both parties sought the opinions of medical experts to potentially testify at trial.

In late 2023, defendant's former attorney, G. Whitney McRipley, consulted Marcus DeGraw, M.D., as a potential defense expert. According to McRipley, he had two hourlong conversations with Dr. DeGraw in which "significant confidential information was discussed," including "potential defense strategies," McRipley's "thoughts on the case," Dr. DeGraw's analysis of the case, and McRipley's thoughts on Dr. DeGraw's analysis. Dr. DeGraw later

---

[1] *People v Amerson*, unpublished order of the Court of Appeals, entered April 17, 2025 (Docket No. 375165).

submitted an invoice of $3,000 for 10 hours of work on the case, which was paid by the Oakland County Indigent Defense Services Office (IDSO).

After McRipley withdrew as counsel, his successor, defendant's current attorney Lindsay Abramson, also spoke with Dr. DeGraw. Abramson avers that she and Dr. DeGraw had "a detailed phone conversation," in which they discussed "significant confidential information, Dr. DeGraw's medical opinions, and defense strategy." Following this call, Abramson decided not to call Dr. DeGraw as an expert witness, and, accordingly, he was not noticed as a witness. Defendant ultimately retained a different expert witness, Dr. Doug Smith, M.D.[2]

Beginning in early 2025, the assistant prosecuting attorney assigned to the case, Christopher George ("APA George"), had a series of contacts with Dr. DeGraw. According to APA George, he initially contacted Dr. DeGraw to see "if he would be willing to review the case" and Dr. Smith's expert report, believing that Dr. DeGraw had not been retained by the defense and not knowing that Dr. DeGraw had been paid by IDSO for 10 hours of work on the case. According to APA George, "Dr. DeGraw responded that he did not have a recollection of the case details, but that he would be willing to review it." Dr. DeGraw also told APA George that he knew Dr. Smith and did not believe that he was qualified to be an expert in the proffered field.

On March 3, 2025, Dr. DeGraw emailed his fee schedule and retainer agreement to APA George. The same day, a text exchange between them occurred as follows:

> [*APA George*]: I did have one question: did you sign any agreement with Gil McRipley or have any privileged conversations with him? I don't want to infringe on any attorney protected work.

> [*Dr. DeGraw*]: So he contacted me way back in Nov 2023. I don't believe he ever signed my agreement but I did submit an invoice to Oakland County and was paid for my review of the case.

> [*Dr. DeGraw*]: Gil and I only spoke briefly.

> [*Dr. DeGraw*]: In March 2024, Lindsay Abramson told me she took over. At some point around then we discussed my impressions. I don't recall any details at all of that conversation in the least.

> [*APA George*]: If you remember, did your conversation with Lindsay include anything more than you giving her your thoughts about the case. If not, I don't see a reason I can't call you as a witness.

> [*Dr. DeGraw*]: No. That would have been the only discussion.

---

[2] The prosecution later moved to exclude Dr. Smith from testifying under *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993), but its motion was denied.

[*APA George*]: Given that, I'll submit a request to retain you. Thank you.

That day, APA George filed an amended notice of intent to call experts, stating that APA George "may call Dr. Marcus DeGraw who is an expert in the field of Child Abuse Pediatrics" and that his testimony "would be offered to corroborate the other treating doctors in this case and to rebut [the testimony of] witness Doug Smith . . . ."

On March 11, Abramson sent APA George an e-mail objecting to Dr. DeGraw on grounds that the defense had previously retained and consulted with him. APA George texted Dr. DeGraw as follows:

> Good afternoon Doc, I wanted to let you know that I'm getting a lot of push back from the defense about hiring you. They claim it would be some kind of atty/client violation and that I'm prohibited from working with you. I'm looking into this, but wanted to keep you in the loop. Chris[.]

Dr. DeGraw responded, "Ok, sounds good."

On March 18, defendant moved to strike Dr. DeGraw from the prosecution's witness list, asserting that "Dr. DeGraw was a retained and paid defense expert who obtained privileged and confidential information about the defendant and the defense strategy." Defendant also moved to set an evidentiary hearing to determine whether a motion to disqualify the prosecutor's office was necessary, stating that "[i]f the assigned prosecutor knew that Dr. DeGraw was retained as a defense expert on this case and proceeded to hire him anyway, this would likely constitute a deliberate intrusion into the attorney-client privilege." On March 21, in response, the prosecution denied that a legal basis existed to strike Dr. DeGraw as an expert witness but stated that it would delete Dr. DeGraw from its witness list nevertheless. That day, APA George texted Dr. DeGraw, notifying him of his decision not to retain him as a witness:

> Hey Doc, I wanted to let you know that Lindsay Abramson is making a fuss about me asking you to review some things on the Amerson case. (see defense motion) I don't believe that she has any legitimate legal argument to strike you as a witness, but it will likely cause you unnecessary aggravation if I were to continue with you. At this point, I'll remove you from my witness list to save you the headaches of having to deal with this. I also filed a motion to strike Doug Smith, which should be granted. I'll reach back out if anything comes up, but otherwise I'll see you on the next one. Thanks again.

Dr. DeGraw texted, "ok sounds good."

At the hearing on defendant's motion for an evidentiary hearing, APA George asserted that the issue was moot because he no longer planned to call Dr. DeGraw as an expert witness and because he did not learn any confidential information in his discussions with Dr. DeGraw. At the conclusion of the hearing, the trial court invited—but explicitly did not order—defendant to submit (1) a list of what the evidentiary hearing would involve, including evidence, witnesses, questions for witnesses, and potential exhibits; (2) a case, binding authority or not, of a "tainted prosecutor" in which disqualification was mandatory; and (3) an example, not necessarily caselaw, "of how

the taint of a prosecutor would necessarily, or even possibly, manifest in this trial if a tainted prosecutor was allowed to continue in the case."

In lieu of responding to the trial court's invitation for supplemental briefing, defendant moved to disqualify APA George and the entire Oakland County Prosecutor's Office, relying principally on *People v Joly*, 336 Mich App 388, 399; 970 NW2d 426 (2021), a case in which this Court affirmed the suppression of physical evidence on due-process grounds as a remedy for the prosecution obtaining incriminating evidence by deliberately intruding upon the attorney-client privilege. The prosecution filed a response opposing the motion, which included a detailed recitation of all contacts between the prosecutor and Dr. DeGraw as outlined above, stating "[t]he above statements represent the entirety of the conversations with Dr. DeGraw and the People about this case."

Following a hearing, the trial court denied defendant's motion. This interlocutory appeal followed.[3]

## II. STANDARDS OF REVIEW

When a trial court has granted or denied a motion for disqualification of counsel, this Court reviews for clear error any findings of fact, and we review de novo the trial court's application of the law to the facts. *People v Tesen*, 276 Mich App 134, 141; 739 NW2d 689 (2007). "We also review de novo questions of constitutional law." *Joly*, 336 Mich App at 395. A trial court's decision whether to hold an evidentiary hearing is reviewed for abuse of discretion. *People v Unger*, 278 Mich App 210, 216-217; 749 NW2d 272 (2008).

## III. ANALYSIS

### A. DUE PROCESS

Defendant argues that the prosecutor's office must be disqualified from the case because the prosecution violated defendant's due-process rights by infringing on confidential and privileged information discussed by the defense and a retained expert concerning professional impressions and case strategy. We disagree.

Both the United States and Michigan constitutions prohibit the government from depriving a person of life, liberty, or property without due process of law. US Const, Am XIV; Const 1963, art 1, § 17.

> In the context of criminal proceedings, the denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice. This is a relatively high bar—only if the absence of that fairness fatally infected the judicial process will there be a violation of due process. In analyzing the issue, courts look to the totality of circumstances. [*Joly*, 336 Mich App at 399.]

---

[3] This Court also stayed further proceedings pending resolution of this appeal.

Neither the attorney-client privilege nor the work-product privilege are constitutional rights, and violation of either privilege alone is insufficient to establish a due-process violation, but "[c]aselaw has long recognized that outrageous misconduct by the government in detecting and obtaining incriminating evidence can rise to the level of a due-process violation." *Id.* at 399-400. "[T]he judiciary is extremely hesitant," however, "to find law enforcement conduct so offensive that it violates the Due Process Clause." *Id.* at 404.

Defendant relies principally on *Joly*, 336 Mich App at 401, in which this Court addressed a claim that the government violated a defendant's right to due process by infringing on the attorney-client privilege. There, police executing a search warrant intentionally opened and read an e-mail between the defendant and his attorney, and then used the information they discovered in the e-mail to retrieve incriminating evidence. The defendant moved to suppress the evidence as a remedy, the trial court granted that motion, and this Court affirmed. Adopting a test from *United States v Voigt*, 89 F3d 1050, 1067 (CA 3, 1996), we held that "only a finding of 'outrageousness' would warrant the exclusion of evidence for a violation of due process." *Joly*, 336 Mich App at 401. To establish "outrageousness" in that context, we held that a defendant must show "(1) the government's objective awareness of an ongoing, personal attorney-client relationship between [the attorney] and the defendant; (2) deliberate intrusion into that relationship; and (3) actual and substantial prejudice." *Id.* (quotation marks and citation omitted, brackets in original). We concluded that those requirements were met in *Joly*, and defendant argues that they are satisfied here as well.

In a number of ways, *Joly* is an imperfect fit for the situation before us. First, defendant seeks disqualification of the prosecutor and his office, not the exclusion or suppression of evidence.[4] Disqualification of counsel was not a remedy contemplated or discussed in *Joly*, so we cannot look directly to *Joly* to determine whether it is a potentially appropriate remedy here— assuming, of course, that *Joly*'s "outrageousness" test is otherwise satisfied. Additionally, defendant contends that the prosecution infringed on the attorney-client privilege, but most if not all of the allegedly confidential information in question would likely be covered by the attorney work-product privilege, not the attorney-client privilege. Compare MCL 767.5a(2) (attorney-client privilege protects "communications between attorneys and their clients") with MCR 2.302(B)(3) ("protect[ing] against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation"); *Franzel v Kerr Mfg Co*, 234 Mich App 600, 621-622; 600 NW2d 66 (1999) (recognizing that "thoughts, mental impressions, formulations of litigation strategy, and legal theories of the attorney" as conveyed to their retained expert is protected by the work-product privilege); and *People v Holtzman*, 234 Mich App 166, 169; 593 NW 2d 617 (1999) (recognizing work-product privilege "applies in the context of criminal proceedings").[5] *Joly* involved a government intrusion into

---

[4] As stated above, the prosecution has already agreed not to call Dr. DeGraw as a witness.

[5] It is possible for the attorney-client privilege to extend to client communication shared with experts. See *Estate of Teutsch v Van De Ven*, 336 Mich App 604, 612; 971 NW2d 666 (2021); *Grubbs v K Mart Corp*, 161 Mich App 584, 590; 411 NW2d 477 (1987); *People v Marcy*, 91 Mich App 399, 406; 283 NW2d 754 (1979). But the record does not reflect that the attorney-client

attorney-client communications (specifically, an e-mail the defendant wrote to his attorney), and this Court did not comment on whether government infringement on the attorney work-product privilege would be subject to the same scrutiny.

Despite these differences, we understand defendant to be proposing that the overall *Joly* framework—and specifically its three-part due-process test—be adapted and applied to the facts before us to determine whether the prosecution's conduct regarding Dr. DeGraw amounts to a violation of defendant's right to due process. If it does, then defendant is arguing that the proper remedy for that violation is disqualification of the prosecutor's office. We accept defendant's invitation to conduct the analysis in that fashion—assuming, without deciding, that *Joly* applies to attorneys' confidential discussions with experts; and assuming, without deciding, that disqualification could, in appropriate circumstances, be the appropriate remedy for a due-process violation. Cf. *People v Herrick*, 216 Mich App 594, 599; 550 NW2d 541 (1996) (discussing statutory basis for disqualification of prosecutors for conflicts of interest "arising from a professional attorney-client relationship, such as when the prosecutor has become privy to confidential information"). As explained below, after adapting and applying the three-part *Joly* test here, we conclude that defendant's right to due process was not violated.

1. KNOWLEDGE OF CONFIDENTIAL RELATIONSHIP

Beginning with the first element of the *Joly* test, and adapting it to the controversy before us, we consider whether the prosecutor had objective awareness of a confidential relationship between defendant or his counsel and Dr. DeGraw. This first element of the *Joly* test actually consists of two subparts: whether there was a confidential relationship, and whether the government knew or should have known about it. See *Voigt*, 89 F3d at 1069 (rejecting due-process claim where "the record [was] wholly devoid of any evidence that the government was or should have been aware of a personal attorney-client relationship").

To determine whether defendant's relationship with Dr. DeGraw was a confidential one, we turn to *Estate of Teutsch v Van De Ven*, 336 Mich App 604; 971 NW2d 666 (2021). In that case, this Court adopted a multifactor test to determine whether an expert witness called by one party should be disqualified from testifying because of a prior relationship with another party. Although disqualification of Dr. DeGraw as a witness is not directly before us because the

_____

privilege was implicated here. McRipley's affidavit states that the confidential information he discussed with Dr. DeGraw "included potential defense strategies in the case, my own thoughts on the case, the analysis of the case by Dr. DeGraw, and my thoughts on his analysis." Abramson states that the confidential information she discussed with Dr. DeGraw consisted of "my impressions of the case, my ideas for trial defense strategy, my thoughts regarding cause and manner of death, my impressions of what the People's strategy would be, and how I may attack that strategy at trial. Dr. DeGraw also shared his detailed medical opinions of the case with me." As neither attorney specifically indicated or implied that attorney-client communications were shared with Dr. DeGraw, we presume that, to the extent a privilege applies, it is most likely the work-product privilege, not the attorney-client privilege.

prosecution has voluntarily removed him from their witness list, *Estate of Teutsch* informs whether defendant's relationship with Dr. DeGraw is a confidential one under the version of the *Joly* test we apply here. Disqualification of an expert witness is appropriate under *Estate of Teutsch* only if (1) it was objectively reasonable for the first party who claims to have retained the expert witness to conclude that a confidential relationship existed and (2) confidential or privileged information was disclosed by the first party to the expert.[6] *Id.* at 610. In determining whether it was objectively reasonable to conclude that a confidential relationship existed, courts consider

> (1) whether the relationship was longstanding and involved frequent contacts, (2) whether the expert was to be called as a witness in the underlying case, (3) whether the parties entered into a formal confidentiality agreement, (4) whether the expert was retained to assist in the litigation or paid a fee, (5) whether work product was discussed or the party provided documents to the expert, and (6) whether the expert derived any of his specific ideas from work done under the direction of the retaining party. [*Id.* at 611.]

No single factor is dispositive. See, e.g., *id.* at 612 (noting that "a confidential relationship can exist absent a confidentiality agreement between the retaining party and the expert") (quotation marks omitted).

Guided by *Estate of Teutsch*, we conclude that defendant or his counsel did have a confidential relationship with Dr. DeGraw. McRipley's affidavit stated that he had two hourlong conversations with Dr. DeGraw in which "significant confidential information was discussed," including "potential defense strategies in the case, [McRipley's] thoughts on the case, the analysis of the case by Dr. Degraw, and [McRipley's] thoughts on his analysis." Abramson said she and Dr. DeGraw had similar interactions. Dr. DeGraw was paid $3,000 by IDSO for 10 hours of work. On these facts, it was reasonable for defense counsel to conclude that a confidential relationship existed. And, although the issue is now moot, because confidential or privileged information was disclosed by defense counsel to Dr. DeGraw, it was appropriate for the prosecution to remove Dr. DeGraw from their witness list. See *Estate of Teutsch*, 336 Mich App at 610.

However, that is not the end of the inquiry for due-process purposes, as *Joly* asks not only whether a confidential relationship existed, but also whether the government was objectively aware of the relationship. See *Joly*, 336 Mich App at 401. Although APA George was apparently aware that defense counsel had spoken with Dr. DeGraw, Dr. DeGraw told APA George that he spoke only briefly with defense counsel, he recalled no details of those conversations, they consisted only of him giving defense counsel his thoughts and impressions about the case, no formal agreement was ever signed, and he was paid for his work. Although the fact that Dr. DeGraw was paid a fee—a relevant factor under *Estate of Teutsch*, 336 Mich App at 611—might have raised a yellow flag indicating that some caution was warranted before proceeding, the facts considered

---

[6] Courts must also consider "the public interest in allowing or not allowing an expert to testify." *Estate of Teutsch*, 336 Mich App at 610; see *id.* at 613 (listing "public-interest considerations").

together do not demonstrate the government's objective awareness. See *Joly*, 336 Mich App at 401.

## 2. DELIBERATE INTRUSION

Turning to the second element of the *Joly* test, we consider whether there was "deliberate intrusion" into the confidential relationship with Dr. DeGraw. *Id.* at 401. As with the first element, there are actually two subparts to this inquiry: whether there was an intrusion, and if so whether it was deliberate. We conclude that there was no deliberate intrusion.

As discussed above, although APA George solicited Dr. DeGraw to be a potential expert for the prosecution, the evidence reflects that he did not know at the time that Dr. DeGraw had a confidential relationship with defendant. APA George asked Dr. DeGraw if he had signed any agreement with defense counsel or had any privileged conversations with them, specifically saying "I don't want to infringe on any attorney protected work." Additionally, approximately 10 days after defense counsel objected and APA George learned more about the nature of defense counsel's communication and relationship with Dr. DeGraw, APA George voluntarily (albeit somewhat begrudgingly) removed Dr. DeGraw from the prosecution's witness list and concluded his communication with Dr. DeGraw about the case. Thus, if there was an intrusion on a confidential relationship, it is difficult to see how it could be characterized as a deliberate one. See *id*. at 402-403.

We also see no evidence that an intrusion, deliberate or not, actually occurred. In the relationship between a party and an expert, an attorney's communication to the expert of their mental impressions and legal strategies are privileged work product. *Estate of Teutsch*, 336 Mich App at 612. Defendant's attorneys shared such information with Dr. DeGraw, but Dr. DeGraw did not, in turn, divulge such information to APA George; in fact, Dr. DeGraw apparently had no recollection of any information conveyed to him by defendant's attorneys. Additionally, there is little risk that Dr. DeGraw will suddenly remember confidential information and share it with the prosecution or at trial, since his relationship with the prosecution was terminated shortly after defense counsel raised her concerns. In sum, although there was contact between the prosecution and an expert with whom defendant or his counsel had a confidential relationship, there was no actual intrusion into that relationship.

These facts stand in stark contrast to those of *Joly*, where police not only opened and read an e-mail that they knew was a communication between the defendant and his attorney, but the detective on the case then proceeded to "double[] down on the breach and used the privileged information to further his investigation of [the] defendant." *Joly*, 336 Mich at 405. Here, the prosecution did not deliberately solicit confidential information or try to use it to their advantage; in fact, the prosecution did not even obtain any such information, inadvertently or otherwise.

## 3. PREJUDICE

Even if we were to characterize the prosecution's conduct as a deliberate intrusion into a confidential relationship of which they were or should have been aware, we would nonetheless conclude that on the third element of the *Joly* test, see *id*. at 401, defendant suffered no actual and substantial prejudice from APA George's contact with Dr. DeGraw. Defendant asserts that the

prosecution *could* have an "unfair strategy advantage" at trial on the basis of what Dr. DeGraw learned about the case and potentially shared with APA George.[7] But, as previously described, the record reflects that the prosecution learned no confidential information from Dr. DeGraw. Additionally, as stated, there is little risk that Dr. DeGraw will divulge confidences going forward because the prosecution prudently terminated their relationship with him shortly after learning the extent of his relationship with defendant and his attorneys. We therefore conclude that defendant suffered neither "actual" nor "substantial" prejudice. *Id.*

## B. REQUEST FOR EVIDENTIARY HEARING

Defendant requests, as an alternative form of relief, that this Court remand for an evidentiary hearing. However, defendant also asserts that the motion for an evidentiary hearing filed in the trial court "remains unruled on." Insofar the trial court did not enter an order denying his motion for an evidentiary hearing, we lack jurisdiction to exercise appellate review. MCR 7.203(B). We granted leave to review the order denying defendant's motion to disqualify the prosecutor's office, and the appeal is limited to the issues raised in defendant's application. See MCR 7.205(E)(4).

Regardless, in light of our analysis above, the trial court did not abuse its discretion by denying his motion to disqualify without first holding an evidentiary hearing. See *United States v Panitz*, 907 F2d 1267, 1274 (CA 1, 1990) (affirming denial of due-process outrageousness claim without evidentiary hearing where material facts were not legitimately in dispute). The trial court invited defendant to develop his argument in support of his motion for an evidentiary hearing by specifying what evidence, witnesses, questions, and exhibits would be presented, but defendant did not do so. On appeal, defendant does not explain how an evidentiary hearing would be likely to develop the record in a materially significant way. See *People v Dunbar*, 463 Mich 606, 617 & n 13; 625 NW2d 1 (2001) (holding that, in light of the duty of candor, "in the absence of evidence to the contrary, we will accept a licensed attorney's assertion to a court"); *People v Everett*, 318 Mich App 511, 524-525; 899 NW2d 94 (2017) ("Absent some evidence to refute the prosecutor's assertions . . . there is no reason to disbelieve the prosecutor's representations as an officer of the court bound by a duty of candor."). Should evidence come to light that is materially different from what was before the trial court when it ruled on defendant's motion, defendant is not precluded from seeking further relief.

---

[7] Defendant also argues that the prosecutor could use information gleaned from Dr. DeGraw to "formulate his questioning of Dr. Smith at trial." However, defendant offers no explanation of what confidential or privileged information Dr. DeGraw learned from defense counsel that could be used for that purpose.

## IV. CONCLUSION

Because the prosecution's communication with defendant's expert witness did not violate defendant's right to due process, the trial court did not err in denying defendant's motion to disqualify the Oakland County Prosecutor's Office. Accordingly, the trial court's order is affirmed.

/s/ Thomas C. Cameron
/s/ Christopher M. Murray
/s/ Daniel S. Korobkin